## A.E. STALEY MANUFACTURING CO., Petitioner,

v.

## SECRETARY OF LABOR, Respondent.

No. 00–1530.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 2002.

Decided July 23, 2002.

Sally J. Scott argued the cause for petitioner. With her on the briefs was Robert E. Mann.

Scott Glabman, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief were Joseph M. Woodward, Associate Solicitor, and Bruce F. Justh, Counsel.

Before: EDWARDS, HENDERSON, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

A.E. Staley Manufacturing Company petitions for review of a final order of the Occupational Safety and Health Review Commission (OSHRC). The Commission found that Staley committed 89 willful violations of 29 C.F.R. § 1910.307(b) (the "hazardous locations standard"), which mandates that electrical equipment in hazardous locations be approved for use in such locations. OSHRC also concluded that Staley committed two willful violations of 29 C.F.R. § 1910.1200(h) (the "hazard communication standard"), which requires employers to provide employees with effective information and training regarding hazardous chemicals in their work areas. Staley does not dispute that it committed the violations, but contends that the Commission erred in deeming them willful. Finding no error, we deny the petition for review.

## I

Staley is a corn refiner that produces corn starch, corn oil, fructose, and dextrose at a number of facilities. This case concerns Staley's Decatur, Illinois plant. In 1990, the plant included over 130 buildings and had approximately 833 hourly employees. In July of that year, the Occupational Safety and Health Administration (OSHA) [1] began an inspection of the plant, prompted by a May 1990 accident in which an employee was fatally asphyxiated. As a result of the inspection, the Secretary of Labor, acting through OSHA, issued two sets of citations alleging hundreds of violations of the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. §§ 651–678. One set of citations alleged violations of safety standards, including the hazardous locations standard, 29 C.F.R. § 1910.307(b). The other set charged violations of health standards, including the hazard communication standard, id. § 1910.1200(h), and the asbestos standard, id. § 1910.1001(j)(2), (k)(1).

Partial settlements led to the withdrawal of all citations for non-willful violations. Staley contested the remaining 177 safety and four health citations, and the Commission assigned an Administrative Law Judge (ALJ) to hear the case. The ALJ upheld 171 of the safety citations and all four of the health citations. However, he concluded that only 87 of the safety violations (all for hazardous locations) and two of the health violations (both for asbestos) were willful. He found the remaining violations, including the two violations of the hazard communication standard, to be serious but not willful. [2] Both parties appealed the ALJ's decision to OSHRC.

The Commission affirmed all of the ALJ's findings of violations, as well as all of his findings of willfulness. In addition, it upgraded several violations from serious to willful, including two further hazardous locations violations (making a total of 89) and the two hazard communication violations (which it grouped as one for penalty purposes). In finding willfulness, the Commission relied on evidence that previous dust explosions, internal audits, and a survey by the National Institute for Occupational Safety and Health had put Staley on notice of serious safety and health problems, including the location of non-approved electrical equipment in the vicinity of combustible dust and a lack of employee training concerning dangerous chemicals. The Commission concluded that Staley's continued failure to take corrective action in the face of these widespread problems supported a determination of willfulness.

1. As the Supreme Court has explained, the OSH Act "assigns distinct regulatory tasks to two different administrative actors": the Secretary of Labor and OSHRC. *Martin v. OSHRC*, 499 U.S. 144, 147, 111 S.Ct. 1171, 1174, 113 L.Ed.2d 117 (1991). The Secretary, who has delegated certain statutory duties to OSHA, is responsible for setting and enforcing workplace health and safety standards. If the Secretary determines that an employer is not complying with a standard, she is authorized to issue a citation and assess a penalty. 29 U.S.C. §§ 658, 659. OSHRC is responsible for "carrying out adjudicatory functions" under the Act. *Id.* § 651(b)(3). If an employer contests a citation, an ALJ appointed by the Commission makes an initial decision, which becomes a final order of the Commission unless it grants discretionary review. *Id.* § 661(j). Both employers and the Secretary may seek review of Commission orders in the courts of appeals. *Id.* § 660(a), (b).

2. An employer guilty of a "serious" violation of a health or safety standard "shall be assessed a civil penalty of up to $7,000 for each such violation." 29 U.S.C. § 666(b). An employer who "willfully or repeatedly" violates such a standard, however, "may be assessed a civil penalty of not more than $70,000 for each violation, but not less than $5,000 for each willful violation." *Id.* § 666(a).

*A.E. Staley Mfg. Co.*, 19 O.S.H. Cas. (BNA) 1199, 1221–22 (O.S.H.R.C.2000). Staley then filed a petition for review in this court pursuant to section 10(c) of the OSH Act, 29 U.S.C. § 659(c).

## II

■ A reviewing court must uphold the factual findings of the Commission if they are "supported by substantial evidence on the record considered as a whole," 29 U.S.C. § 660(a), and must uphold its other conclusions as long as they are not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, 5 U.S.C. § 706(2)(A). *See Anthony Crane Rental, Inc. v. Reich*, 70 F.3d 1298, 1302 (D.C.Cir. 1995). Moreover, "[w]e defer to the Secretary's interpretation of the Act and regulations, upholding such interpretations so long as they are consistent with the statutory language and otherwise reasonable." *Id.* (citing *Martin v. OSHRC*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991)).

■ Staley does not contest the Commission's findings that it committed serious violations of the OSH Act. It disputes only the findings that the 89 hazardous locations and two hazard communication violations were willful. In the OSH Act context, a willful violation is "an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements." *Kaspar Wire Works, Inc. v. Secretary of Labor*, 268 F.3d 1123, 1127 (D.C.Cir.2001) (quoting *Conie Constr., Inc. v. Reich*, 73 F.3d 382, 384 (D.C.Cir.1995)). The Commission based its findings of willfulness on its determination that Staley

was plainly indifferent to the requirements of the Act.

Staley argues that the Commission committed two errors in deeming its violations willful. First, Staley contends that substantial evidence does not support the Commission's determination that the company was plainly indifferent to its violations of OSHA standards. Second, with respect to the hazardous locations standard, Staley maintains that even if there were evidence of its plain indifference to that standard, the Commission legally erred in finding willfulness without finding that the company knew of each specific violation cited by OSHA. We consider these two arguments in Parts III and IV below.

## III

■ The Commission found Staley willful because it demonstrated plain indifference to its violations of the standards requiring it: (1) to use only approved electrical equipment in hazardous locations, and (2) to train and inform its employees regarding hazardous chemicals in their work areas. Staley maintains that there is an absence of substantial evidence to support findings of plain indifference with respect to either standard. We disagree.

### A

The 89 violations of the hazardous locations standard, affirmed by the Commission and undisputed by Staley, all involved the presence of non-approved electrical equipment in Class II, Division 2 locations.[3] The equipment at issue included exposed wiring, bulbs without protective

---

**3.** Class II, Division 2 locations include locations where "dust may be in suspension in the air as a result of infrequent malfunctioning of handling or processing equipment, and dust accumulations resulting therefrom may be ig-

nitible by abnormal operation or failure of electrical equipment," as well as locations "where dust accumulations might form on or in the vicinity of electric equipment." 29 C.F.R. § 1910.399.

globes, and improperly sealed junction boxes—all potential ignition sources for combustible dust. The evidence of Staley's plain indifference to those violations is as follows.

In May 1987, Staley conducted a mock OSHA inspection and found unsafe electrical equipment in places that Staley considered Class II, Division 2 locations, including the elevators and Buildings 9, 44, and 75—all places in which OSHA inspectors subsequently found violations at issue in this case. Joint Appendix (J.A.) at 325, 327–28, 339. Two years later, in April 1989, an internal audit conducted by Staley safety engineer Ken Page turned up more instances of unprotected electrical equipment in hazardous locations. Page's handwritten report warned that Building 44 had "literally gone to hell in a handbasket" and contained "hundreds of safety type violations." J.A. at 361. Page testified that those violations included uncovered electrical boxes and exposed wires. Supplemental Appendix (S.A.) at 47–48. He recommended that a wall-to-wall audit of the plant be conducted as soon as possible, and noted that Staley's potential liability for OSHA penalties was very high. J.A. at 361–62.

Page's recommendation for a wall-to-wall audit was not approved. Page testified that his supervisor, Lynn Elder, director of Staley's department of environmental sciences and safety, told Page that he had advised Bob Jansen, corporate vice president of operations, of Page's findings. Jansen reportedly replied that he was aware of the problems in the plant, but that another Staley project had priority. Page also testified that Elder told him that he should not distribute his report because "the legal department would crucify us." Instead, Elder suggested that Page's report be either destroyed, or stamped "privileged and confidential" and sent to the legal department. Page, however, did not destroy the report. He kept a copy for himself and gave copies to three others, including Bob Trent, Decatur's chief of plant protection, and Jim Brinkmeyer, the corporate industrial hygienist. Elder did permit Page to make an oral presentation to plant staff during which he explained his findings in detail. But Elder assigned another auditor, J.B. Webb, the supervisor of the Decatur safety department, to revise Page's written report. The revised report substantially toned down Page's language and omitted references to hundreds of the specific electrical and safety violations that Page had observed. J.A. at 363–65; S.A. at 38–43, 51–52.

In May 1989, a major dust explosion and fire occurred at the Decatur plant. It was not the first: other explosions and fires had occurred in several buildings over the years. In the same month, an insurance loss-control report for Building 44 noted open electrical junction boxes, and warned that "[m]oisture, lint, dust and combustible materials can easily come in contact with the exposed wiring and create a potential ignition." S.A. at 10–11, 56–58. The following year, after the fatal May 1990 accident, Staley's president instructed Page to conduct another audit of the plant. Page submitted a report that identified exposed wires, conduits, breaker boxes, junction boxes, and bulbs in hazardous locations. The locations again included the elevators and Buildings 9 and 75. J.A. at 122, 373–74, 390, 417–19; S.A. at 59–67.

Two months later, OSHA conducted the inspection that resulted in the findings of 89 violations of the hazardous locations standard. That inspection also revealed that many of Staley's supervisory personnel were not properly trained regarding the hazards presented by Class II, Division 2 areas. Some were not even aware that the areas they supervised were classi-

fied locations. Others received no training on the classification of areas or the requirements for such areas. For example, Michael Slimbarski, the plant operations manager, had not been trained concerning the hazardous locations standard and, with one exception, did not know which areas of the plant were classified. J.A. at 269–70. Shift coordinators Gordon Green and Ron Young were also untrained on the standard and unaware that faulty electrical equipment could produce dust explosions. J.A. at 283–89, 304–05. Even electricians lacked training regarding the existence of classified hazardous locations in the plant. S.A. at 183.

We agree with the Commission that the evidence just recited constitutes substantial evidence that the 89 hazardous locations violations were part of a pattern or practice of plain indifference to violations of that standard. *A.E. Staley Mfg. Co.,* 19 O.S.H. Cas. (BNA) at 1222.[4] The series of internal reports between 1987 and 1990 put Staley on notice of unsafe electrical equipment in hazardous locations, and of the persistence of that problem over the years covered by those reports. A series of dust explosions and fires, although not themselves caused by faulty electrical equipment, also put the company on heightened notice of the dangers of combustible dust. Yet despite this notice, the company failed to train its employees about such hazards, attempted to suppress Page's internal audit report, and ignored his recommendations for correction. Within months of Page's last audit, OSHA inspectors found the same kinds of unsafe equipment in many of the same locations that Page did. This evidence is more than sufficient to sustain the Commission's determination of willfulness. *See, e.g., Cater-*

*pillar, Inc. v. OSHRC,* 122 F.3d 437, 441 (7th Cir.1997) (holding that the fact that an employer "rejected or ignored the recommendations of the very person" it had asked to make safety recommendations showed plain indifference to employee safety).

Staley's principal attacks on the sufficiency of the evidence require only brief mention. First, the company contends that the 89 violations were too few to demonstrate plain indifference, as the equipment involved represented only a small percentage of all of the company's electrical equipment. That is not an adequate defense. Even a single violation of the OSH Act may be found willful, regardless of whether the workplace is otherwise safe. *See Kaspar Wire Works,* 268 F.3d at 1128 (holding that an employer cannot "contend that it was entitled to rely on its lack of prior violations to undermine a finding of willfulness," because then "an employer with no prior citations could choose to violate a regulatory obligation without risking a finding of willfulness"); *Valdak Corp. v. OSHRC,* 73 F.3d 1466, 1469 (8th Cir.1996).

Staley also argues that Page's report did not heighten its awareness of safety problems at Decatur because his handwritten notes were never given to plant staff. As described above, there is substantial evidence to the contrary: Page gave his notes to both Bob Trent and Jim Brinkmeyer; they were read by his supervisor, Lynn Elder; they were orally reported by Elder to vice president Jansen; and Page recounted them in a detailed oral presentation to the staff. That knowledge is properly imputed to the company. *See Caterpillar, Inc. v. Herman,* 154 F.3d 400,

---

4. The Commission specifically found that the hazardous locations violations "have a similar factual basis and are reflective of a pattern or practice by Staley of ignoring the hazard of explosive dust." 19 O.S.H. Cas. (BNA) at 1213 n. 28.

402 (7th Cir.1998). Moreover, to the extent that Page's report was not more widely disseminated, it was only because Elder directed that it not be distributed, and that a revised report—omitting references to hundreds of specific violations—be distributed instead. S.A. at 38–43, 51–52. Such willful blindness is no defense at all. *See United States v. Schnabel,* 939 F.2d 197, 203 (4th Cir.1993).

■ Finally, Staley argues that the Commission ignored evidence of its good faith efforts to comply with the hazardous locations standard, pointing specifically to its plant-wide (joint) safety committee and to the 25 separate departmental safety committees that were scheduled to meet monthly to address safety issues. The joint committee, however, lacked authority to initiate or direct corrective action, while the departmental safety committees held their meetings only half the time. S.A. at 115–16. Moreover, the record shows that many members of the departmental committees were dismayed at Staley's safety program: many resigned because safety problems were not corrected, meetings were canceled, and management either did not attend meetings or sent different managers each month. S.A. at 103–04, 120–21. Far from being evidence of good faith, then, the record of Staley's safety committees offers only further evidence of the company's plain indifference to its violations of safety standards.

### B

■ Staley also contends that substantial evidence does not support the Commission's determination that the company exhibited plain indifference to the two hazard communication violations. Those violations were: (1) failing to provide hazard communication training for twelve substances (including silica sand, filteraid,[5] asbestos, and feed dust) for which Staley did not have material safety data sheets (MSDSs);[6] and (2) failing to train employees regarding the meaning of the hazard communication symbols used on the company's ethylene oxide, propylene oxide, caustic, and sulfuric acid storage tanks. The evidence of Staley's plain indifference is as follows.

In November 1988, the Decatur plant's joint health and safety committee warned of serious deficiencies in Staley's hazard communication program. In a memorandum, the committee noted that bags of filteraid were strewn around and that the material was tracked all over Building 11—one of the buildings specifically named in OSHA's 1990 hazard communication citation. The committee further noted that "[b]uilding personnel need to be trained on the danger of this product." *A.E. Staley Mfg. Co.,* 19 O.S.H. Cas. (BNA) at 1204; S.A. at 22.

In March 1989, the National Institute for Occupational Safety and Health (NIOSH) conducted an evaluation of health hazards at the Decatur plant. NIOSH industrial hygienists observed that Staley employees were improperly trained with respect to the hazards of toxic chemicals. NIOSH also found that employees

---

5. Filteraid is the generic name for a filtering material used in the beverage industry. Staley's filteraid is composed largely of silica, exposure to which may result in silicosis, a potentially lifethreatening lung disease. *See A.E. Staley Mfg. Co.,* 19 O.S.H. Cas. (BNA) at 1204 n. 10, 1205 n. 13.

6. The hazard communication standard requires employers to make available to their employees MSDSs for hazardous chemicals in the employees' work areas. 29 C.F.R. § 1910.1200(h)(2)(iii). An MSDS must contain detailed information about the physical characteristics and health hazards of the chemical. *Id.* § 1910.1200(g)(2).

disregarded an alarm that sounded when ethylene oxide and propylene oxide leaked into the air, that they did not have immediately available respirators, and that they engaged in work practices that increased their exposure to chemicals. S.A. at 3–5. Following its evaluation, NIOSH sent J.B. Webb, the Decatur safety supervisor, a summary of its findings:

> [W]e feel there is significant potential for chemical overexposures in the starch reaction area, and possibly throughout the starch stream. This appears to be due to improper work practices, poor management oversight, and emphasis of production over worker safety. Included among the chemicals used in this area are ethylene oxide, propylene oxide, and vinyl acetate. Ethylene oxide is currently regulated as a cancer hazard by [OSHA]. Propylene oxide is very similar in chemical structure to ethylene oxide and is currently being evaluated by NIOSH with regard to potential carcinogenicity.... In addition, lack of training and demand for product seems to have circumvented measures which were specifically implemented to reduce potential exposure.

S.A. at 5.

Ken Page's April 1989 audit disclosed further serious deficiencies in employee training regarding hazardous substances. Page noted that hazardous chemicals were not properly labeled, annual training was not being conducted in several buildings, and employees lacked access to MSDSs. He also observed large quantities of filter-aid on the floor of two buildings, including Building 11, and continuing problems with the material in a third. *A.E. Staley Mfg. Co.*, 19 O.S.H. Cas. (BNA) at 1205; J.A. at 341–45, 347–48, 350–53, 359–60. A second auditor, Robert Moore, notified his supervisor about the results of the audit and the presentation Page made to plant staff:

The staff was told that the Hazard Communications Compliance, Respiratory Protection Compliance, and Hazardous Material Control had deteriorated since we last conducted such a survey (1986). *In our opinion, an OSHA inspection prompted by the NIOSH visit could potentially result in the assessment of major penalties.*

S.A. at 6 (emphasis added).

Notwithstanding these warnings, Staley management told Page that completing another project had priority over correcting the problems he had identified. A year later, when Page undertook another audit following the fatal May 1990 accident, he found that containers of hazardous materials were improperly labeled in two buildings, updated MSDSs were absent in two buildings, and hazard communication training had not been conducted for years. Page received no feedback from Staley regarding his May 1990 report. J.A. at 400, 406, 415; S.A. at 43, 87.

As noted above, when OSHA inspected the plant in July 1990, it cited Staley for failing to train employees regarding twelve hazardous substances for which Staley did not have MSDSs, including silica sand, filteraid, asbestos, and feed dust; and for failing to train employees concerning the symbols used to label the ethylene oxide, propylene oxide, caustic, and sulfuric acid storage tanks. The inspection found that many of Staley's managers had received little or no training about OSHA compliance, and that both managers and hourly employees were untrained regarding the cited hazardous chemicals. MSDSs were mostly either unavailable or kept in locked offices. Of particular concern, employees working in the vicinity of hazardous chemicals like ethylene oxide and propylene oxide were untrained in the labeling system and had no idea what the colors and numbers meant. As a consequence, they were

unaware of the hazards posed by the chemicals and of how to protect themselves. J.A. at 186–207, 234–40, 277, 298; S.A. at 105–14, 169–86.

We again agree with the Commission that this record evidence is more than sufficient to sustain its findings that Staley was plainly indifferent to its violations of the hazard communication standard. The NIOSH evaluation and internal surveys and audits gave Staley a heightened awareness of its hazard communication problems, including problems with the specific chemicals for which Staley was later cited. Yet, the company responded unappreciatively to those warnings and substantially failed to ensure the required training of its managers and employees. In the Commission's words, "Staley's Haz-Com program remained grossly deficient." *A.E. Staley Mfg. Co.,* 19 O.S.H. Cas. (BNA) at 1205.

Staley seeks to minimize the scope of its failure by noting that the training violations concerned "only" 15 of 120 buildings and 12 of 1200 hazardous materials used at the Decatur plant. As we have already noted, however, an otherwise safe workplace does not prevent findings of willfulness with respect to those violations that do occur. Moreover, five of the chemicals cited in the two health violations—ethylene oxide, propylene oxide, sulfuric acid, asbestos, and silica—are among Staley's "mean fifteen" chemicals, the most dangerous in the plant. All five may produce acute or chronic health effects in exposed employees. S.A. at 22–23, 88–89; *see* 29 C.F.R. § 1910.1200(c). Accordingly, Staley's effort to minimize its violations of OSHA's health standards is unavailing, and we conclude that the Commission was justified in describing Staley's attitude toward its violations as "plain indifference to[ ] the Act's

requirements." *Kaspar Wire Works,* 268 F.3d at 1127.

## IV

Staley's second major argument is that, even if it was plainly indifferent to the requirements of the OSH Act, its violations of the hazardous locations standard were not willful because it was unaware of the specific conditions for which it was cited. There is no evidence in the record, Staley notes, that its management knew of the precise uncovered electrical boxes and exposed wires discovered by the OSHA inspectors. Although these conditions were of the same kind and in the same locations as problems found in earlier internal audits, Staley stresses that OSHA cannot prove that they were the same pieces of noncompliant equipment. In the company's view, "implicit to a finding of willfulness is employer knowledge of the existence of a condition, an awareness that the condition does not meet the Act's requirements . . . , and a conscious decision not to correct the condition. . . ." Staley Br. at 14.

Staley offers little support for this position, and we reject it. The OSH Act authorizes its most severe civil penalties for any employer who "willfully" violates a health or safety standard. 29 U.S.C. § 666(a); *see supra* note 2. The Act does not itself define "willfully." In its decision below, the Commission, citing its own precedents, defined a willful violation as one "committed with intentional, knowing or voluntary disregard for the requirements of the Act, *or* with plain indifference to employee safety." *A.E. Staley Mfg. Co.,* 19 O.S.H. Cas. (BNA) at 1202 (quoting *Falcon Steel Co.,* 16 O.S.H. Cas. (BNA) 1179, 1181 (OSHRC 1993), and *A.P. O'Horo Co.,* 14 O.S.H. Cas. (BNA) 2004,

2012 (OSHRC 1991)) (emphasis added).[7] Under this definition, "plain indifference" to violations of the Act is an alternative to "knowing or voluntary disregard" (also referred to as "conscious disregard"), and willfulness can be inferred from evidence of plain indifference without direct evidence that the employer knew of each individual violation. *See also A.E. Staley Mfg. Co.*, 19 O.S.H. Cas. (BNA) at 1202 (describing the "state of mind" required as "conscious disregard or plain indifference for the safety and health of employees" (citing *General Motors*, 14 O.S.H. Cas. (BNA) at 2168)).

Staley seeks to undermine the Commission's formulation by pointing to a definition of "willfully" that this court has often cited in OSH Act cases: "an act done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements." *Kaspar Wire Works*, 268 F.3d at 1127 (quoting *Conie Constr.*, 73 F.3d at 384). Placing great stress on the location of the word "voluntarily" in the *Kaspar Wire Works* formulation, Staley contends that this definition requires that an act be both voluntary *and* done with plain indifference to be regarded as willful. Moreover, for a violation to be "voluntary," Staley insists, the company's management must know that the specific piece of equipment at issue was noncompliant and then must decide not to correct it.

The Secretary of Labor agrees that *Kaspar Wire Works* applies here, but she does not regard its definition of willful as different from that applied by the Commission. In the Secretary's view, as in the Commission's, there are two prongs to the definition: conscious disregard and plain indifference. Only the former requires direct evidence that the employer knew of the specific noncomplying condition. If proven, plain indifference substitutes for knowledge of the specific condition as a means of inferring the employer's willful intent.

Because the OSH Act is silent as to the meaning of "willful," we are required to defer to the Secretary's interpretation as long as it is reasonable. *Anthony Crane Rental*, 70 F.3d at 1302 (citing *Martin*, 499 U.S. at 150–51, 111 S.Ct. at 1175–76). Where "the Secretary and the Commission agree, there is no question but that we must accord deference to their joint view." *RAG Cumberland Res. LP v. Federal Mine Safety & Health Review Comm'n*, 272 F.3d 590, 596 (D.C.Cir.2001) (referring to a parallel statutory scheme under the Mine Act). We find that joint view reasonable in this case.

The use of a state of mind like plain indifference as a substitute for knowledge of a specific condition is well recognized in other legal contexts.[8] In *Daskalea v. District of Columbia*, for example, this court held that the District of Columbia was "deliberately indifferent" to, and hence liable under 42 U.S.C. § 1983 for, its jail guards' sexual abuse of a female prisoner—even without evidence that District policymakers knew of the harassment of

---

7. *Accord Branham Sign Co.*, 18 O.S.H. Cas. (BNA) 2132, 2134 (O.S.H.R.C.2000); *Pepperidge Farm Inc.*, 17 O.S.H. Cas. (BNA) 1993, 1998 (OSHRC 1997); *J.A. Jones Constr. Co.*, 15 O.S.H. Cas. (BNA) 2201, 2209 (OSHRC 1993); *General Motors Corp., Electro–Motive Div.*, 14 O.S.H. Cas. (BNA) 2064, 2068 (OSHRC 1991).

8. *See, e.g., McGinty v. New York*, 193 F.3d 64, 69 (2d Cir.1999) (holding that to prove a willful violation of the Age Discrimination in Employment Act, evidence of "reckless disregard" is an alternative to evidence of actual knowledge); *Saba v. Compagnie Nationale Air France*, 78 F.3d 664, 667 (D.C.Cir.1996) (holding that "reckless disregard" is equivalent to "willful misconduct" for purposes of liability under the Warsaw Convention).

the particular prisoner. 227 F.3d 433, 441–43 (D.C.Cir.2000). In *Daskalea,* indifference was proven by evidence that the District had been on notice of prior incidents against other prisoners, that similar incidents nonetheless continued, and that the District failed to train or supervise its officers adequately. *Id.* The parallels to the evidence of Staley's indifference, as recounted in Part III above, are obvious.

Staley notes that in many cases under the OSH Act, employers have been found liable for willful violations where they "were aware of the requirements of the standard *and* the noncompliant condition, but deliberately chose not to comply with the requirements." Staley Br. at 13 (emphasis added) (citing *Donovan v. Williams Enters., Inc.,* 744 F.2d 170, 179–80 (D.C.Cir.1984), and *Conie Constr.,* 73 F.3d 382). Staley's observation is correct, but nondispositive. The fact that cases have found willfulness where both kinds of knowledge were proven does not mean that both are required. Staley points to no case in which, although an employer was plainly indifferent to compliance with an OSHA standard, a violation was found non-willful because the employer did not know of the specific unlawful condition. Indeed, Staley concedes that many OSH Act cases have found violations willful even without evidence that the employer was aware of the applicable *standard.*[9] In those cases, plain indifference substituted for employer knowledge, even though the cases proclaimed—as Staley proclaims with respect to knowledge of conditions—

that "there must be evidence that an employer knew of an applicable standard." *Williams Enters., Inc.,* 13 O.S.H. Cas. (BNA) 1249, 1257 (OSHRC 1987); *see id.* (stating that evidence of "reckless disregard" can substitute for evidence of "familiarity with the standard's terms").

Moreover, although Staley cannot point to a case that directly supports its position, the Secretary of Labor can point to several that support hers. One is *Kaspar Wire Works* itself. In that case, we upheld the Commission's finding that Kaspar committed hundreds of willful violations of the OSH Act by failing to record serious injuries on an OSHA reporting form. The Commission noted the volume of violations, the seriousness of the unreported injuries, and the abundant evidence of Kaspar's actual knowledge of what was required under OSHA's reporting regulations. *Kaspar Wire Works,* 268 F.3d at 1126. Although the employer claimed that it had not purposely changed its recordkeeping practices to omit the injuries, we held that "[f]rom this evidence, the Commission could reasonably infer" that "Kaspar Wire's recordkeeping practices underwent a dramatic" and intentional change. *Id.* at 1128.

Another case to which the Secretary directs our attention is *Pepperidge Farm Inc.,* 17 O.S.H. Cas. (BNA) 1993, 1998 (OSHRC 1997). In that case, the Commission again found the employer to have committed numerous willful violations of the Act by failing to report occupational injuries. The Commission deemed the vio-

---

9. *See Valdak,* 73 F.3d at 1469 ("Valdak's claimed ignorance of the OSHA standard does not negate a finding of willfulness. Willfulness can be proved by 'plain indifference' to the Act's requirements."); *Georgia Elec. Co. v. Marshall,* 595 F.2d 309, 320 (5th Cir. 1979) (rejecting the claim that a company "cannot be held liable for willfully violating provisions of which it was unaware," and holding that it "is precisely because the Com-

pany made no effort whatsoever to make anyone with supervisory authority ... aware ... that the Company can be said to have acted with plain indifference and thereby acted willfully"); Staley Reply Br. at 4 (agreeing that "plain indifference is applicable in situations where the employer did not know of the standard's requirements but had a reckless disregard for employee safety").

lations willful notwithstanding that "no one at Pepperidge checked the accuracy" of the firm's report form—and thus, in Staley's terms, notwithstanding that the company lacked knowledge of the specific cited conduct. *Id.* at 1999. Willfulness was established by evidence that, despite the fact that its officials had a "heightened awareness" of OSHA recordkeeping requirements, the employer failed to provide basic training to those making the entries and "made no attempt to remedy" the recordkeepers' lack of understanding. *Id.* at 2000. The parallels to Staley's conduct are, again, obvious.

Ironically, given its focus on the *Kaspar Wire Works* formulation, Staley's principal response to the Secretary's citation of *Kaspar Wire Works* and *Pepperidge Farm* is to suggest that the Commission decided them wrongly. Staley Br. at 21. Since this court affirmed *Kaspar Wire Works,* that is not a winning argument. Alternatively, Staley argues that recordkeeping cases should be treated differently from equipment cases. But since both involve violations by omission, it is reasonable for the Secretary and the Commission to regard them as of a piece. Indeed, we see little distinction between *Kaspar Wire Works* and *Pepperidge Farm,* where the willful violations were failures to include serious injuries in reports, and this case, where the violation was a failure to use only approved equipment in hazardous locations.

Finally, we are also persuaded by the Secretary's argument that, were she not permitted to substitute plain indifference for knowledge of specific conditions, cases like this one—in which the citation is for failing to act rather than for affirmatively acting—would be difficult if not impossible to prove. *Cf. Saba v. Compagnie Nationale Air France,* 78 F.3d 664, 668 (D.C.Cir.1996) (noting that, if recklessness were not permitted as a proxy for intent in Warsaw Convention cases, "it might be all too easy for the wrongdoer to deliberately blind himself to the consequences of his tortious action"). Indeed, to adopt Staley's position would be to write the doctrine of "willful blindness," well known in the criminal law, out of OSH Act enforcement. That doctrine "allows the jury to impute the element of knowledge to the defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." *Schnabel,* 939 F.2d at 203. As we pointed out at oral argument, under Staley's formulation, a company could avoid liability for willful violations of OSHA standards by literally blindfolding its safety inspectors: because the inspectors could not see the unsafe conditions, the conditions could not be regarded as "voluntary." Although Staley's counsel conceded that, under her client's proposed rule, those violations would not be willful, she suggested that Staley might make an exception for such an egregious case. But both the making of exceptions and the crafting of general rules are tasks the statute delegates to the Secretary, not to Staley. And as long as those rules are reasonable, as they are here, we are bound to defer.

## V

The record in this case contains ample evidence that Staley's violations of the hazardous locations and hazard communication standards were committed with plain indifference to the requirements of the OSH Act. The Commission was therefore well within its discretion to find those violations willful and to assess the attendant penalties. Accordingly, the petition for review is

*Denied.*