Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 21, 2003  Decided December 19, 2003

No. 02-1379

AMERICAN WRECKING CORPORATION,
PETITIONER

v.

SECRETARY OF LABOR,
RESPONDENT

———

On Petition for Review of an Order of the
Occupational Safety and Health Review Commission

———

*Joseph P. Paranac, Jr.* argued the cause and filed the briefs for petitioner.

*John Shortall*, Attorney, U.S. Department of Labor, argued the cause for respondent. With him on the brief were *Joseph M. Woodward*, Associate Solicitor, and *Bruce F. Justh*, Counsel.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before:  GINSBURG, *Chief Judge*, and EDWARDS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*:  Petitioner American Wrecking Corporation ("AWC") was the subcontractor on a demolition project at which a fatal accident occurred in February 1996. Following the accident, officials from the Department of Labor investigated the project and cited the general contractor, IDM Environmental Corporation ("IDM"), and AWC for, *inter alia*, willfully violating an Occupational Safety and Health Administration ("OSHA") regulation that requires the removal of all "loose material" from buildings during demolition.  IDM and AWC contested the citations and the Secretary of Labor ("Secretary") then filed a complaint with the Occupational Safety and Health Review Commission ("Commission").

A hearing was held before an Administrative Law Judge ("ALJ") to review the citations issued by the Secretary.  The ALJ upheld the citations against IDM and AWC, both as to liability and the willfulness of the violation.  Upon review, the Commission affirmed the ALJ's findings of liability, but set aside the ALJ's holding on willfulness. The Commission remanded the case for further findings by the ALJ on the question of willfulness, because it was unclear on the record whether AWC and IDM were "plainly indifferent" to their employees' safety or simply mistaken about the dangers involved at the work site.  On remand, the ALJ once again found AWC and IDM guilty of willful violations of the Act. The Commission denied AWC's request for review.  AWC now seeks review of this final order.

We deny AWC's petition for review insofar as it challenges the Commission's finding that AWC violated the loose material safety standard.  Substantial evidence on the record supports this determination.  The Commission's finding of willfulness, however, is not supported by substantial evidence on the record considered as a whole.  We therefore grant the petition for review insofar as it challenges the determination that AWC *willfully* violated the Act.

## I.  BACKGROUND

This case arises out of a fatal accident at a demolition site at the Steel Point Generating Station ("Steel Point") in Bridgeport, Connecticut.  Steel Point was an electric power plant complex consisting of several buildings that were constructed in the 1920s and 1930s.  In 1995, after Steel Point had been idle for roughly a decade, the owner, United Illuminating Company ("United Illuminating"), initiated plans to demolish the complex.  United Illuminating selected IDM as the general contractor for asbestos removal and demolition at Steel Point.  IDM in turn awarded a subcontract to petitioner AWC to perform certain demolition work.  AWC began its demolition work in June 1995.  Throughout the course of demolition at Steel Point, AWC's activities on the site were supervised by Frank Bartolotti.  In February 1996, several months into the demolition project, AWC prepared to demolish the turbine generator building.  This large steel-frame structure – 60 to 80 feet wide, 400 to 500 feet long, and 50 to 60 feet high – formerly housed the generator area of the power plant.  AWC adopted the "selected precut demolition" method to raze the turbine building.  This approach required removal of the exterior masonry of the building, leaving the roof and a skeleton of steel columns.  These steel columns in turn would be cut selectively in order to control the direction in which the building would fall upon demolition.

In preparation for demolition, Frank Bartolotti operated a front end loader with an attachment known as a "rake" to remove the exterior bricks from the turbine generator building.  Although he intended to remove all the bricks, Bartolotti was unable to reach the highest bricks on the south wall of the building because the rake was not long enough to reach them, given the slope of the ground on the south side of the building.  As a result, Bartolotti left about 15 feet of bricks near the top of the steel skeleton on the south wall.  The bricks were suspended for the most part over two steel columns, designated columns 14 and 15, and were at least partly supported by an iron beam known as a channel iron that formed a kind of transom across columns 14 and 15.  An

4

expert witness familiar with the site later estimated that the suspended bricks weighed roughly 14 tons.

On February 27, 1996, two AWC employees were making the necessary preparatory cuts to the steel columns surrounding the turbine building. Around 1:30 p.m., one employee, Percy Richards, was alone in the basket of a "manlift" using a blowtorch to make cuts in columns 14 and 15 when the columns collapsed and the suspended bricks fell, killing Mr. Richards. The site was immediately secured, and an OSHA compliance officer arrived at the scene soon thereafter to investigate the site. In August 1996, at the conclusion of the inspection, the officer issued three citations each to IDM and AWC, including, *inter alia*, a charge that the contractor and subcontractor willfully violated an OSHA regulation requiring the removal of all "loose material" from the steel skeleton of a building during demolition. *See* 29 C.F.R. § 1926.854(f) (1989). Both companies contested the various citations. The Secretary then filed a complaint before the Commission.

All citations against both AWC and IDM were consolidated in the administrative proceedings. A six-day hearing was held before the ALJ in April 1997. The Secretary introduced evidence consisting primarily of photographs of the demolition site before the accident and expert testimony based on those photographs. Central to the Secretary's case was a photograph identified at the hearing as Exhibit C-15. *See* Appendix ("App.") 420. The photograph depicts the south end of the turbine generator building sometime before the February 27, 1996, accident, but after Bartolotti had removed all the exterior bricks except those that fell during the accident. Witnesses for AWC and IDM testified that the bricks were not loose prior to the accident, because they were supported by the 10-inch-wide channel iron that connected columns 14 and 15. Exhibit C-15 showed, however, that some of the bricks were hanging below the channel iron or to the left or right of the columns, beyond the ends of the channel iron. *See* Tr. at 142-44 (4/8/97), *reprinted in* App. 66; App. 420.

In addition to the photographic evidence, the Secretary introduced the testimony of two expert witnesses who concluded, based in part on the depiction of the south wall in Exhibit C-15, that the bricks were unstable prior to the accident. The first expert, Russell Geisser, testified on the basis of a visit to the accident site and examination of the photograph that the bricks were not supported by the channel iron. Rather, the bricks were supported only by mortar, which had a "practical value of zero" in terms of lending any stability to the bricks. *See* Tr. at 252-57 (4/8/97), App. 99-101. The suspended bricks, according to Geisser, were in a "meta stable condition," such that the "tiniest little thing" could cause the bricks to collapse. Tr. at 254 (4/8/97), App. 100. A second expert, Joseph Maitz, also testified on the basis of Exhibit C-15, stating that the bricks in the picture appeared to be in an unsafe and unstable condition and to be in danger of falling. Tr. at 315-16 (4/9/97), App. 120; Tr. at 363-66 (4/9/97), App. 135-36.

Contrary to the testimony of these expert witnesses, Frank Bartolotti testified that, after he removed the majority of the bricks from the steel skeleton of the turbine building, he believed that the remaining bricks on the south wall were supported by the channel iron and therefore stable. In particular, he stated that he felt the bricks "were stabile enough and secure enough" that they safely could be left in place. Tr. at 117 (4/8/97), App. 58. Employees of IDM similarly testified that the bricks were not loose because they were supported by the channel iron. Any bricks that were not so supported were secured by mortar, clips, and wire mesh. Accordingly, none of these witnesses who had viewed the south wall prior to the accident believed the bricks to be loose. *See* Tr. at 144 (4/8/97), App. 66; Tr. at 516, 520-21 (4/10/97), App. 183-84; Tr. at 891-93 (4/15/97), App. 301-02; Tr. at 925 (4/15/97), App. 312; Tr. at 952-53 (4/15/97), App. 320.

In addition to these disagreements regarding the security of the bricks on the south wall, it was revealed during the hearing that IDM had fallen behind on the demolition schedule it had agreed upon with United Illuminating. The delay

evidently resulted from unexpected difficulties during asbestos removal. According to witnesses for IDM and AWC, AWC was not at fault for the delay. Witnesses acknowledged that United Illuminating had repeatedly chastised IDM regarding the missed deadlines, *see* Tr. at 540-41 (4/10/97), App. 190, but asserted that no pressure was brought to bear on AWC to expedite its portion of the demolition project, *see* Tr. at 215-17 (4/8/97), App. 88; Tr. at 778-79 (4/11/97), App. 265.

The ALJ found that AWC willfully violated OSHA's loose material safety standard. *See Am. Wrecking Corp.*, 1998 O.S.H.D. (CCH) ¶ 31603 (O.S.H.R.C. 1998), *reprinted in* App. 622-42. On the question of liability, the ALJ credited the testimony of the Secretary's expert witnesses that the bricks were not supported and were therefore in danger of falling. The ALJ also emphasized that Exhibit C-15 clearly depicted the bricks suspended on the south wall with no support. *See* 1998 O.S.H.D. (CCH) at *6-8, App. 631-34. With respect to the willfulness of the violation, the ALJ determined that Frank Bartolotti possessed the requisite "heightened awareness" of the hazard to support a finding of willfulness on the part of AWC. The ALJ made no specific findings in this regard, but stated that the record was "replete with evidence" of willfulness. *See* 1998 O.S.H.D. (CCH) at *10-11, App. 638. The ALJ imposed the maximum penalty of $70,000 for this willful violation.

Upon review, the Commission affirmed the ALJ's finding that AWC had violated the safety standard. *See Am. Wrecking Corp.*, 19 O.S.H. Cas. (BNA) 1703 (O.S.H.R.C. 2001), *reprinted in* App. 693-717. Rejecting AWC's claim that Exhibit C-15 was not properly authenticated, the Commission held that the photograph and the expert testimony "clearly established that the bricks … were far from securely attached and were thus 'loose material.'" 19 O.S.H. Cas. (BNA) at *6, App. 701. On the issue of willfulness, however, the Commission concluded that the ALJ failed to provide sufficient findings of fact and credibility determinations to support the finding of willfulness. The Commission therefore set aside the ALJ's holding and remanded the case with instructions to the ALJ to reevaluate the evidence and recon-

sider whether the violation was willful. *See* 19 O.S.H. Cas. (BNA) at *11-14, App. 710-14. The Commission specifically instructed the ALJ to consider the credibility of Frank Bartolotti's testimony that he felt the bricks were secure prior to the accident. *See* 19 O.S.H. Cas. (BNA) at *12, App. 711-12. On this point, the Commission held that it "[could] not find that AWC had the requisite heightened awareness of the hazard" to support a finding of willfulness if Bartolotti had testified credibly when he said that he saw the bricks to be secure. *Id.*

On remand, the ALJ again held that AWC willfully violated the loose material standard. *See Am. Wrecking Corp.*, 19 O.S.H. Cas. (BNA) 2093 (O.S.H.R.C. 2002), *reprinted in* App. 719-26. In support of this decision, the ALJ made general credibility determinations regarding several witnesses, including Frank Bartolotti. However, the ALJ did not address the specific testimony cited by the Commission in its order. Rather, the ALJ concluded that the unsafe condition of the bricks was "so obvious" to a person of Mr. Bartolotti's experience that any belief he may have entertained that the bricks were secure was unreasonable. 19 O.S.H. Cas. (BNA) at *4, App. 725. The ALJ further speculated that Bartolotti and other supervisors permitted this unsafe condition to persist, because they faced time pressures as a result of the delays in the demolition project. With no credible evidence to support his conclusion, the ALJ opined that time pressures caused AWC "to place expediency above safe work practices." 19 O.S.H. Cas. (BNA) at *5, App. 726.

The ALJ reinstated a penalty of $70,000 against AWC for a willful violation of the loose material standard. The Commission denied AWC's petition for discretionary review, and the ALJ's decision accordingly became a final order of the Commission. AWC filed this petition for review.

## II. ANALYSIS

The Occupational Safety and Health Act of 1970 ("the Act") "establishes a comprehensive regulatory scheme designed 'to assure so far as possible . . . safe and healthful working

conditions' for 'every working man and woman in the Nation.'" *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 147 (1991) (quoting 29 U.S.C. § 651(b)). The Act imposes on employers a general duty to keep workplaces "free from recognized hazards that are . . . likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1) (2000). The Act additionally authorizes the Secretary to promulgate and enforce specific workplace-safety regulations, and the Secretary has delegated this authority to OSHA. *See A.J. McNulty & Co. v. Sec'y of Labor*, 283 F.3d 328, 330 (D.C. Cir. 2002) (citing 29 U.S.C. § 655(b); 65 Fed. Reg. 50,017 (Aug. 16, 2000)). The OSHA standard at issue in this case governs the demolition of "skeleton-steel" buildings. The regulation requires that if the steel framing of such a building is left in place during the demolition of masonry, "all steel beams, girders, and similar structural supports shall be cleared of all loose material as the masonry demolition progresses downward." 29 C.F.R. § 1926.854(f) (1989).

OSHA compliance officers regularly inspect workplaces. Upon discovery of a violation, a compliance officer may issue a citation in one of three categories: "not serious," "serious," or "willful." *See A.J. McNulty*, 283 F.3d at 330 (citing 29 U.S.C. § 666(a)-(c)). The applicable penalties differ in each category, with "willful" violations being subject to the highest fines. *See id.* If an employer challenges a citation, the Secretary must prove the violation at a hearing before an administrative law judge. To establish a violation, the Secretary bears the burden of proving "that (1) the standard applies, (2) the employer failed to comply with the terms of the standard, (3) employees had access to the cited condition, and (4) the employer knew, or, with the exercise of reasonable diligence, could have known of the violative condition." *Conie Constr., Inc.*, 16 O.S.H. Cas. (BNA) 1870, at *1 (O.S.H.R.C. 1994), *aff'd*, 73 F.3d 382 (D.C. Cir. 1995). Employers may seek discretionary review of adverse decisions before the Commission and, in turn, may petition the court of appeals for judicial review of final Commission orders.

We affirm Commission decisions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000); *see also A.J. McNulty*, 283 F.3d at 331-32. The Commission's findings of fact are conclusive if they are supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 660(a); *see also A.J. McNulty*, 283 F.3d at 331; *Conie Constr.*, 73 F.3d at 383-84. The substantial evidence rule requires that the Commission reasonably consider material evidence on both sides, as evidence that is substantial when viewed in isolation may become insubstantial when contradictory evidence is taken into account. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."). When the administrative decision adequately considers contradictory evidence, however, our standard of review does not permit a reviewing court to displace the Commission's choice between conflicting views, even if the court would have made a different choice in the first instance. *See Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 838 (D.C. Cir. 1998) (citing *Universal Camera*, 340 U.S. at 488).

Applying these principles, we deny AWC's petition for review with respect to the Commission's finding of liability, but grant the petition for review with respect to the willfulness of the violation.

## A. Liability

An employer involved in construction or demolition violates the standard by leaving "loose material" attached to the steel skeleton of a building during the course of demolition. 29 C.F.R. § 1926.854(f). In this case, the ALJ found, and the Commission agreed, that the Secretary satisfied her burden of proving that the bricks were loose and that AWC therefore had violated the standard. Substantial evidence supports this finding.

The photograph identified as Exhibit C-15 provided direct evidence that the bricks in question were loose. Both the ALJ and the Commission relied in part on this photographic

evidence that the bricks did not appear to be supported by the channel iron that connected columns 14 and 15. In addition, the photograph formed a basis for the opinions of the Secretary's expert witnesses. The ALJ found both experts to be credible and qualified to render expert opinions on issues pertaining to demolition safety. Both witnesses testified that the suspended bricks posed a serious hazard, because, in their expert opinions, the channel iron did not support all of the bricks and mortar alone would not provide sufficient stability. The ALJ reasonably credited the testimony of these experts over the contradictory testimony of AWC's witnesses. *Cf. Perdue Farms*, 144 F.3d at 838 (deferring to agency's resolution of contradictory evidence).

The expert testimony and the photographic evidence constitute substantial evidence in support of the Commission's finding that AWC violated the loose material standard. AWC argues that Exhibit C-15 was not properly authenticated and therefore should not have been admitted into evidence. Under the applicable Federal Rules of Evidence, *see* 29 C.F.R. § 2200.71 (1989), the photograph could be authenticated if a witness with knowledge testified that it accurately depicted the south wall after the bricks were removed but before the accident occurred. *See* FED. R. EVID. 901(b)(1). The ALJ was initially unwilling to admit the photograph into evidence, because Bartolotti could not remember whether the photograph was a fair and accurate representation of the bricks hanging on the south wall prior to the accident. *See* Tr. at 135-37 (4/8/97), App. 63-64. Subsequently, however, Bartolotti indicated that the photograph fairly depicted the condition of the building prior to the accident. Tr. at 140 (4/8/97), App. 65. On this basis, and with no objection from AWC or IDM, the ALJ admitted the photograph into evidence "as a general representation of the work site prior to the time that the collapse occurred." Tr. at 195 (4/8/97), App. 82.

The record thus is clear that the ALJ relied on Bartolotti's testimony that the photograph constituted a fair representation of the work site prior to the accident and admitted it on that basis over no objection. The ALJ and the Commission were therefore entitled to rely on the photograph as an

accurate depiction of the scene of the violation before the accident. More important, however, having failed to object when the ALJ admitted the photograph into evidence, AWC cannot now contend that the photograph was inadmissible. The photograph, together with the expert testimony based upon it, constitutes substantial evidence in support of the Commission's finding that AWC violated the standard.

## B. Willfulness

As noted above, willful violations of the Act are subject to the highest penalties, with a minimum fine of $5,000 and a maximum fine of $70,000. 29 U.S.C. § 666(a). Although neither the Act nor Commission regulations define the term "willful," the relevant case law establishes that a violation is willful when " 'done voluntarily with either an intentional disregard of, or plain indifference to, the Act's requirements.' " *Kaspar Wire Works, Inc. v. Sec'y of Labor*, 268 F.3d 1123, 1127 (D.C. Cir. 2001) (quoting *Conie Constr.*, 73 F.3d at 384); *see also A.J. McNulty*, 283 F.3d at 337-38; *Ensign-Bickford Co. v. Occupational Safety & Health Review Comm'n*, 717 F.2d 1419, 1422 (D.C. Cir. 1983) (citing cases). The Commission applies this same standard in its adjudications. *See, e.g.*, *North Landing Line Constr. Co.*, 19 O.S.H. Cas. (BNA) 1465, at *13 (O.S.H.R.C. 2001) ("A violation is willful if it is committed with (1) intentional, knowing, or voluntary disregard for [the Act], or (2) plain indifference to employee safety."). As the Commission has explained,

> [a] willful violation is differentiated from a nonwillful [violation] by a heightened awareness, a conscious disregard or plain indifference to employee safety.

*Id.* (quoting *Valdak Corp.*, 17 O.S.H. Cas. (BNA) 1135, at *2 (O.S.H.R.C. 1995)). A company cannot be found to have willfully violated a standard if it exhibited a good faith, reasonable belief that its conduct conformed to law, *see A.J. McNulty*, 283 F.3d at 338, or if it made a good faith effort to comply with a standard or eliminate a hazard, *see, e.g.*, *A.E. Staley Mfg. Co.*, 19 O.S.H. Cas. (BNA) 1199, at *4 (O.S.H.R.C. 2000), *aff'd*, 295 F.3d 1341 (D.C. Cir. 2002).

In this case, the ALJ made an initial determination that AWC willfully violated the loose material safety standard. Upon review, the Commission ruled that the ALJ had failed to make sufficient credibility determinations and findings of fact to support this conclusion. The Commission therefore remanded the case to the ALJ with specific instructions to reconsider the finding of willfulness. In particular, the Commission emphasized that the "key issue" with respect to AWC's willfulness was "the truthfulness of Bartolotti's testimony that he 'felt [the bricks] were stabile enough and secure enough.'" *Am. Wrecking Corp.*, 19 O.S.H. Cas. (BNA) 1703, at \*12, App. 711. The Commission was clear that unless this specific testimony was discredited, there could be no finding that AWC had the requisite "heightened awareness" to support a finding of willfulness. *See* 19 O.S.H. Cas. (BNA) at \*12, App. 711-12.

Despite the Commission's clear instructions, the ALJ made no specific credibility determination with respect to the cited testimony. Rather, the ALJ merely offered vague and elusive observations that Bartolotti was a "nervous witness who displayed a distinct lapse of memory for matters of importance," that he "provided contradictory testimony," and that he was "ill at ease and attempted to temper his testimony in a fashion most favorable to his employer." *Am. Wrecking Corp.*, 19 O.S.H. Cas. (BNA) 2093, at \*4, App. 724. These observations neither respond to the Commission's precise instructions nor specifically discredit Bartolotti's testimony that he felt the bricks were stable enough and secure enough to leave safely in place.

Moreover, the ALJ offered no basis whatsoever for his decision to credit some portions of Bartolotti's testimony but not others. *See* 19 O.S.H. Cas. (BNA) at \*4, App. 725 ("Notwithstanding the foregoing, I find the following testimony to be credible."). This simply will not do, especially not with respect to what the Commission deemed to be the "key issue" in the case. *See P&Z Co.*, 6 O.S.H. Cas. (BNA) 1189, at \*4 (O.S.H.R.C. 1977) ("[W]hat is necessary is a finding that *specifically* resolves conflicting testimony or doubts as to credibility. The finding should *identify* the oral testimony

. . . and reasons must be given . . . for failing to credit a witness whose testimony is neither contradicted nor impeached.") (emphasis added). During the course of the hearing, well into Bartolotti's testimony, the ALJ found Bartolotti to be a "totally credible" witness. Tr. at 116 (4/8/97), App. 58. The ALJ's subsequent findings therefore make no sense. And, most important, the ALJ never specifically discredits Bartolotti's testimony that he saw the bricks to be stable.

Rather than make a specific credibility determination regarding this testimony, the ALJ attempted to discredit Bartolotti on the ground that the demolition project was behind schedule and that AWC accordingly "place[d] expediency above safe work practices." 19 O.S.H. Cas. (BNA) at *5, App. 726. This finding is unsupported by the record and totally ignores clear evidence to the contrary. A management official with United Illuminating testified that the project was behind schedule and that the owner regularly expressed concern to IDM (not to AWC) about the delay. *See* Tr. at 540-41 (4/10/97), App. 190. There is no evidence, however, to support the ALJ's conclusion that this delay caused Bartolotti or any other AWC employees "to disregard a condition which they knew presented a hazard . . . in order to speed up the work process." 19 O.S.H. Cas. (BNA) at *5, App. 725.

In response to direct questioning by the ALJ, Bartolotti testified that he did not know that the demolition contract between United Illuminating and IDM established specific deadlines and imposed financial penalties for failure to complete the project on time. Tr. at 215-17 (4/8/97), App. 88. He further testified that no one ever told him that the work needed to proceed more quickly. Tr. at 216-17 (4/8/97), App. 88. Another AWC employee similarly testified that IDM never asked AWC to speed up its demolition work. Tr. at 1066 (4/15/97), App. 355. Indeed, James Harrigan, a management official with IDM, testified that AWC's work was "never behind schedule" and that IDM did not attempt to pressure AWC into rushing its portion of the project. Tr. at 778-79 (4/11/97), App. 265. The ALJ never discredited any of the testimony given by these witnesses. Instead, the ALJ cited a

single page of the hearing transcript that did not involve Bartolotti or any other AWC employee and that does not refute the testimony of the witnesses who confirmed that AWC did not face any unusual time pressures. *See* 19 O.S.H. Cas. (BNA) at *5, App. 726 (citing Tr. at 487 (4/10/97), App. 174). In short, there is no substantial evidence on this record to support the ALJ's finding of willfulness. *Cf. Universal Camera*, 340 U.S. at 487-88.

The ALJ's conclusory findings as to AWC's "heightened awareness" or "plain indifference" largely depend on the testimony of the Secretary's expert witnesses that a person with Frank Bartolotti's experience *should have known* that the bricks in question presented a hazardous condition. *See* O.S.H. Cas. (BNA) at *4-5, App. 725. The ALJ reasoned that the unsafe condition of the bricks was "so obvious" as to render unreasonable Bartolotti's belief that they were safe, which, thus, proved that AWC's violation was willful. *Id.* This reasoning is patently flawed.

The Act distinguishes between "willful" and "serious" violations. *See* 29 U.S.C. § 666(a)-(b). An employer commits a "serious" violation if it permits a sufficiently hazardous condition to persist, "unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(k). The Secretary must always demonstrate that an employer knew or should have known of a hazardous condition to prove *both* "serious" and "willful" violations. *See Conie Constr., Inc.*, 16 O.S.H. Cas. (BNA) 1870, at *1. A "willful" violation is differentiated from lesser violations by an intentional or conscious disregard for the applicable safety standard or for employee safety. Mere negligence or lack of diligence is not sufficient to establish an employer's intentional disregard for or heightened awareness of a violation. *See, e.g.*, *Kaspar Wire Works*, 268 F.3d at 1129 ("[T]o find willfulness the Commission had to find that [the employer's] conduct involved more than mere negligence or carelessness."); *McLaughlin v. Union Oil Co.*, 869 F.2d 1039, 1047 (7th Cir. 1989) ("[A] negligent violation of the statute is merely 'serious,' and for a 'willful' violation more is necessary."); *J.A. Jones Constr. Co.*, 15 O.S.H. Cas.

(BNA) 2201, at *10 (O.S.H.R.C. 1993) ("Mere lack of diligence or carelessness in failing to discover or eliminate a violative condition does not make a violation willful in nature.").

All courts that have considered the issue have held that the Commission may not find a violation to be willful on the ground that an employer "knew or should have known" of the hazardous condition, for to do so would erase the distinction between violations that are willful and those that are not. *See, e.g.*, *United States v. Ladish Malting Co.*, 135 F.3d 484, 490 (7th Cir. 1998); *Brock v. Morello Bros. Constr.*, 809 F.2d 161, 164 (1st Cir. 1987) (Breyer, J.); *St. Joe Minerals Corp. v. Occupational Safety & Health Review Comm'n*, 647 F.2d 840, 847 (8th Cir. 1981); *Frank Irey, Jr., Inc. v. Occupational Safety & Health Review Comm'n*, 519 F.2d 1200, 1207 (3d Cir. 1975), *aff'd en banc on other grounds*, *id.* at 1215, *and aff'd on other grounds*, *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n*, 430 U.S. 442 (1977).

Even if the record supports the ALJ's conclusion that the hazardous condition of the bricks should have been "obvious" to Bartolotti, this does not support the ALJ's conclusion that AWC willfully violated the loose material standard. The Seventh Circuit has correctly noted that

> [s]ection 666(k) [of the Act] defines a "serious" violation as one that creates a "substantial probability that death or serious physical harm could result" and allows the employer to defend by showing that it "did not, and could not with the exercise of reasonable diligence, know of the presence of the violation" – which is to say, that it was not negligent. A distinction between serious and wilful violations exists only if wilfulness means knowledge that the conditions violate the statute or regulations – actual rather than imputed knowledge, for otherwise we are back to negligence.

*Ladish Malting Co.*, 135 F.3d at 490; *see also St. Joe Minerals Corp.*, 647 F.2d at 847 (stating that an employer is liable for a "serious" violation "if he knew or reasonably should have known of the hazardous condition"); *Bunge Corp.*

*v. Sec'y of Labor*, 638 F.2d 831, 834 (5th Cir. Unit A Mar. 1981) (finding only a "serious" violation where the employer "knew or should have known of the violation").

No matter how this case is viewed, the record does not support a finding that AWC *willfully* violated the Act. The ALJ made no coherent credibility determinations to support such a finding; the ALJ also ignored evidence that refutes his finding; and the willfulness holding is flatly at odds with the controlling case law. In these circumstances, the Commission's judgment on willfulness must be reversed.

## III. CONCLUSION

We deny the petition for review on the issue of liability and affirm the Commission's finding that AWC violated the loose material standard. Because there is no substantial evidence in the record to support the Commission's conclusion as to willfulness, however, we grant the petition for review with respect to the willfulness of the violation.