# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 7, 2021         Decided April 13, 2021

No. 20-1031

THE AMERICAN BOTTLING COMPANY, DOING BUSINESS AS
KEURIG DR PEPPER,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 727,
INTERVENOR

Consolidated with 20-1056

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Corey L. Franklin* argued the cause and filed the briefs for petitioner.

*David A. Seid*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Peter B. Robb*, General Counsel at the time the brief was filed,

*Ruth E. Burdick*, Deputy Associate General Counsel, *David S. Habenstreit*, Assistant General Counsel, and *Julie Brock Broido*, Supervisory Attorney.

*Nancy B.G. Lassen* was on the brief for intervenor International Brotherhood of Teamsters Local 727 in support of respondent. *Joseph D. Richardson* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, MILLETT and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The best laid plans of mice and humans go oft awry.[1] So too for the American Bottling Company. The Company planned to eliminate one of the jobs at its Northlake, Illinois plant and transition those employees to other similar positions. The Company first planned to make the transition in the Spring of 2018. But that did not work out. Then the Company told its employees that it planned to eliminate the classification around Super Bowl weekend in 2019. But that did not work out. Then the Company told them that it would *definitely* eliminate the classification on April 1, 2019. But—again—that did not work out.

Enter the Teamsters Union, which filed to represent a bargaining unit of workers that included the employment position that the Company had thrice tried and thrice failed to eliminate. The Company protested that a representation election was pointless because it really, really, really was going to eliminate the classification on July 21, 2019. The Chicago-based Regional Director of the National Labor Relations Board

---

[1] Adapted from Robert Burns, *To a Mouse, On Turning Her Up in Her Nest with the Plough* (1785).

considered the record evidence and determined that the Company had failed to demonstrate that elimination of the position was both definite and imminent. The Board affirmed, and the workers voted to unionize.

We deny the Company's petition for review of the Board's decision. Given the Company's track record, the Board reasonably concluded that the fourth time might not be the charm for the Company. Or, more specifically, that termination of the position on July 21st was anything but certain.

## I

### A

The National Labor Relations Act protects employees' rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

Section 9(a) of the Act provides that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining[.]" 29 U.S.C. § 159(a). In Section 9(b), Congress granted the Board the discretion to decide on a case-by-case basis "whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof[.]" *Id.* § 159(b).

4

When a group of employees or a union files a petition for a representation election, the Board investigates it and holds a hearing if it has reason to believe that a "question of representation" exists. *NLRB v. Financial Inst. Employees of America*, 475 U.S. 192, 198 (1986) (quoting 29 U.S.C. § 159(c)). As relevant here, a "question of representation exists if a proper petition has been filed concerning a unit appropriate for the purpose of collective bargaining." 29 C.F.R. § 102.64(a); *see also id.* § 102.61(a) (listing required contents of representation petitions). If the Board itself, or through one of its Regional Directors, concludes that the petition meets the statutory and regulatory requirements and the proposed bargaining unit is appropriate under the statute, the Board "directs a representation election by secret ballot to settle the question." *Financial Inst. Employees*, 475 U.S. at 198.

**B**

The American Bottling Company, a subsidiary of Keurig Dr Pepper, manufactures and sells soft drinks around the country, including not just Dr Pepper, but also Snapple, 7 Up, and A&W Root Beer.

The Company operates a bottling and distribution facility in Northlake, Illinois—one of two such facilities it operates in the greater Chicago area. Some Northlake employees bottle the Company's various drinks. Some are truck drivers who deliver the drinks from the production facility to retailers. Some work in sales as account managers, charged with selling the drinks at wholesale to retail stores (such as supermarkets and convenience stores). And some are merchandisers, responsible for making sure those retailers successfully sell the drinks to consumers (for example, by ensuring that the drinks are attractively displayed). This case concerns the latter two jobs—account managers and merchandisers.

In most of its regional markets, the Company assigns job responsibilities to account managers and merchandisers on a geographic basis. That is, each account manager and merchandiser is responsible for selling and merchandising drinks, respectively, to and in all of the stores in their assigned territory.

This was true in the Company's Chicago market, too—with one exception. Because four large chain grocery stores represented a disproportionate amount of its business in the Chicago area, the Company created a "hybrid" role that did not exist in its other regional markets known as the Sales Service Representative ("Representative"). Representatives wore two hats serving simultaneously as account managers and merchandisers, selling the large chain stores the Company's drinks wholesale and ensuring that those stores effectively sold the drinks to consumers.

In 2017, the Company's national headquarters ordered the Chicago outfit to move to the same geographic selling model it used in all of its other regional markets. This meant that the Representative position would be eliminated. The Company began preparing in late 2017 for the necessary changes to its Chicago operations—a process referred to as the "Reroute."

While the Company initially planned to implement the Reroute in the Spring of 2018, contract negotiations with the Company's delivery drivers were ongoing at that time and ultimately resulted in a strike. That stymied implementation of the Reroute.

In November 2018, the Company's area director for Chicago—a man named Brad Troutman—met with the affected employees at the Northlake facility. He informed them that the Reroute was coming, that it would result in the elimination of the Representative job classification, and that

the Company planned to implement the change "around [the] Super Bowl" in late January or early February of 2019. *See* J.A. 22.

But despite the Company's intentions, that deadline too fell by the wayside. As Troutman recalled, the Reroute is an "extremely arduous" and "major process under any circumstance" that "takes weeks and weeks and weeks" to implement. J.A. 38–39. Later, when asked if "there are things that can come up that change that [intended] date because it's * * * an intense process[,]" Troutman agreed that there were. J.A. 39. He added that, while completing the Reroute before the Super Bowl was "the intent," that was not a "locked set in stone date[]." J.A. 39.

The Company then picked a new implementation date of April 1, 2019. On March 14, 2019, Troutman emailed several high-ranking sales executives to notify them that the Company had "finalized the particulars of the [Reroute]" and would "be implementing the [Reroute] effective Monday, 4/1/19." J.A. 22, 160. That new date was also communicated to Jewel Foods, the Company's number-one customer in the region, which responded by sending an internal memo to all of its managers on March 18th informing them that the change would occur on April 1st. According to Troutman, this April 1st date "was locked set in stone it was happening." J.A. 41.

On Wednesday, March 20 and Thursday, March 21, Troutman convened meetings with the Representatives to inform them that the Reroute was going into effect on April 1st, and that their job classification would be eliminated as of that date. Representatives attending the March 20th meeting were told that they would be transitioning into the merchandiser role and were provided offer letters for that position. At the same time, a smaller number of Representatives were invited to the

March 21st meeting and were told that they would be transitioning into the higher-ranking and better-paid account manager role, and they too were provided with offer letters. The offer letters for both classifications stated that the "new position" would be "effective March 31, 2019." J.A. 169 (sample merchandiser offer letter), 172 (sample account manager offer letter), 173–175 (more sample letters).

Even though the Reroute was "locked set in stone it was happening" on April 1st, the Reroute did not happen then. J.A. 41. Less than two weeks before the supposedly set-in-stone date, the Company's delivery team raised a question about the impact of the Reroute on their union contract. The Company agreed to hold off on the Reroute until the contract issue could be resolved.

Upon communicating this delay to its customers, American Bottling received a request from Jewel Foods asking it to either implement the Reroute by May 1st or to hold off until after the very busy Fourth of July holiday. Acquiescing to its client's request, the Company delayed the Reroute still longer.

On June 4, 2019, Brad Allbee—the Regional Vice President in charge of the Company's Chicago operations, and Troutman's supervisor—emailed the Company's Texas-based Senior Vice President of Human Resources and reported that the new "target date" to implement the Reroute was "the week of July 21st." J.A. 170, 180.

On Friday, June 14, Troutman convened yet another meeting of the Representatives. According to his contemporaneous notes, Troutman told the Representatives that the Reroute "will be implemented on Sunday, 7/21/19, with all new assignments going into effect on Monday, 7/22/19. * * * Your new positions will be those that were

assigned to [*sic*] when we had the reroute meetings with the [Representatives] on Wed, March 20th, when we announced the original implementation date of Monday, April 1st." J.A. 171. Troutman testified that this information was provided only orally and that he had not taken attendance to verify that all Representatives were present. None of the Representatives received updated offer letters reflecting a July 21st job-elimination date.

## C

On that same day, June 14th, the International Brotherhood of Teamsters, Local 272 ("Union") filed a petition with the Board to certify a bargaining unit made up of the account managers and Representatives at the Northlake facility. The Company opposed certification on the sole ground that the Representatives should be excluded from the contracting unit given the position's planned elimination.

After conducting an evidentiary hearing, the Board's Regional Director rejected the Company's opposition to a representation election on the ground that the record did not demonstrate definite evidence of an imminent change in the scope of the contracting unit or a fundamental change in the Company's operations. He therefore directed that a representation election be held on July 12th.

The Board subsequently denied the Company's motion to stay the election.

## D

The morning of the election, the Board's agent overseeing the voting convened a meeting with the Company and Union representatives. At that meeting, the Company's representative reiterated that American Bottling planned to eliminate the

Representative position in nine days and so intended to challenge the vote of every Representative who attempted to cast a ballot in the election. The Board's agent responded that she could not accept challenges based on job classification alone, as that issue had been settled by the Regional Director's July 3rd decision.

Ultimately, 30 of the 35 Representatives cast votes, and an additional 32 votes were cast by account managers for a total of 62 votes. In the end, 46 votes were in favor of unionization, with 16 votes opposed.

During the tally of the election results, the Union photographed and/or videotaped the counting proceedings. After announcing the final tally, the Board's agent noticed this conduct and said: "Oh, you should not have been videotaping this, I should have made the announcement at the beginning of the count . . . oh, well." J.A. 226.

On July 21, 2019, the Company effectuated the Reroute.

**E**

American Bottling subsequently filed five objections to the conduct of the election. The Regional Director overruled each of the objections and certified the Union as the representative of the bargaining unit. Under longstanding Board precedent, the Regional Director overruled the first three objections as attempting to relitigate an already-decided issue—namely, whether elimination of the Representative position was sufficiently definite and imminent as to make those employees' inclusion in a representation election improper. He also found that no changed circumstances existed that would allow the Company to circumvent that bar. Finally, the Regional Director overruled the Company's objections based on the Union's recording of the ballot tally

because post-election conduct cannot justify setting aside an election.

The Company timely sought Board review of the Regional Director's Decision and Direction of Election, as well as his Decision on Objections. The Board affirmed in all respects, explaining that the Regional Director correctly reasoned that the proposed contraction of the unit was not definite and imminent considering the Company's "long history of delays[.]"

Then–Board Member McFerran identified two additional grounds for affirmance.[2] She noted that the Decision and Direction of Election could be affirmed under the Board's "substantial and representative" unit doctrine, and also noted that the decision as to the Company's post-election objections to the Representatives' votes could be affirmed because the result of the election would not have changed even if the Representatives' votes had been excluded. For his part, Member Emanuel stated that his vote to affirm was based solely on the Company's failure to demonstrate that its elimination of the Representative classification was definite and imminent.

The Company refused to bargain with the Union in order to seek further review of the Regional Director's decision to certify the bargaining unit. The Board granted summary judgment to the Union on the technical refusal to bargain charge. *American Bottling Co.*, 369 NLRB No. 19 (2020). The

---

[2] President Biden named McFerran as the Chair of the Board during the pendency of this appeal. NLRB, *President Appoints Lauren McFerran NLRB Chairman* (Jan. 20, 2021), https://www.nlrb.gov/news-outreach/news-story/president-appoints-lauren-mcferran-nlrb-chairman (last accessed April 12, 2021).

11

Company filed a petition for review in this court, and the Board cross-applied for enforcement.

**II**

The Board had jurisdiction to review the Regional Director's decisions under 29 U.S.C. § 160(a). We have jurisdiction to review the Board's decision under 29 U.S.C. § 160(e) and (f).

"The Supreme Court repeatedly has noted the 'wide degree of discretion' afforded the Board by Congress in matters concerning the conduct of representation elections." *Timsco Inc. v. NLRB*, 819 F.2d 1173, 1175–1176 (D.C. Cir. 1987) (quoting *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946)). Board determinations regarding such matters are therefore "rarely to be disturbed," *South Prairie Constr. Co. v. Local 627, Int'l Union of Operating Eng'rs*, 425 U.S. 800, 805 (1976) (internal quotation omitted), and we will do so only if such decisions are "arbitrary or not supported by substantial evidence in the record[,]" *Rush Univ. Med. Ctr. v. NLRB*, 833 F.3d 202, 206 (D.C. Cir. 2016) (internal quotation omitted); *see also* 29 U.S.C. § 160(e) (Board's factual findings "shall be conclusive" if they are "supported by substantial evidence on the record considered as a whole."). A finding lacks substantial evidence "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 80 (D.C. Cir. 2015) (internal quotation omitted).

**III**

The Board's decision to order an election in a unit containing Representatives was supported by substantial evidence as the Company failed to show that contraction of the proposed bargaining unit was definite and imminent.

**A**

The delay of an election "almost inevitably works to the benefit of the employer and may frustrate the majority's right to choose to be represented by a union[.]" *Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559, 1563 (D.C. Cir. 1984). Nevertheless, the Board may decline to hold an election if a substantial expansion or contraction of the workforce voting on unionization is "imminent and certain." *Hughes Aircraft Co.*, 308 NLRB 82, 83 (1992) ("The Board has consistently held that it will not conduct an election at a time when a permanent layoff is imminent and certain."); *see NLRB v. Deutsch Post Global Mail, Ltd.*, 315 F.3d 813, 816 (7th Cir. 2003); *see also Matson Terminals, Inc. v. NLRB*, 114 F.3d 300, 305 (D.C. Cir. 1997) (Henderson, J., dissenting) (describing this precedent as the "workforce-in-flux doctrine"). The employer bears the burden of proving that a substantial change is "both imminent and definite." *See Retro Env't, Inc./Green Jobworks, LLC*, 364 NLRB No. 70, at *6 (2016); *see also* Company Reply Br. 14 (acknowledging same).

Substantial evidence supports the Board's decision that the Company had not proven the Reroute was imminent and certain.

First, due to a variety of circumstances, the Company had already failed three times before to meet its prior announced implementation dates, including dates when the evidence of the Company's firm commitment was stronger than it was for the July 2019 proposed date.

Recall that the Company first announced that the Reroute would occur in the Spring of 2018. But then contract negotiations and a strike by delivery drivers forced the Reroute onto the back burner.

13

The Company tried again in early 2019 around the time of the Super Bowl. But the Company found itself unprepared for the "extremely arduous" and complicated blitz of processes that the Reroute entailed. J.A. 38–39. So the Company was forced to punt on that date too.

The Company's third effort to conduct the Reroute on April 1, 2019 seemed certain to go forward. The Company had worked through the details of the process. Troutman testified that, as of March 14th, the Reroute was "locked set in stone it was happening" on April 1st. J.A. 41. Executives in the Company were alerted, J.A. 160, as was the Company's main customer in the Chicago area, Jewel Foods, J.A. 161. Troutman also prepared formal, typeset talking points for meetings with the Representatives in which he informed them that the Reroute "will commence Monday, April 1st." J.A. 164; *see also* J.A. 166. And the Company provided official letters to each of the Representatives, informing them of the "new position, effective March 31, 2019," to which they were being transferred "[a]s part of the 2019 Chicago Area Reroute." J.A. 169, 172, 175. The Company also provided at least some Representatives with information about changes to their pay frequency and benefits, noting that they would "receive [their] last paycheck in [their] current position on 04/05/2019, for time worked 03/24/2019 – 03/30/2019." J.A. 173.

But, alas, the April 1st date went the way of its predecessors and fell through, foiled by an apparently unforeseen need to address delivery driver contract negotiations first. Jewel Foods then asked the Company, if it could not implement the Reroute before May 1st, to delay it until after the spike in soft-drink demand over the Fourth of July holiday.

It was against that backdrop that the Board concluded, based on the Regional Director's factual findings, that the fourth attempt to complete the Reroute in July 2019 was not certain or imminent. While neither the Regional Director nor the Board disputed the Company's desire to effectuate the Reroute at some point, the fact remained that for nearly eighteen months the process had been repeatedly derailed.

Second, the evidence that the July 21st target date would hold firm was far less robust than the evidence in the record for the failed April 1st date. On June 4, the Regional Vice President in charge of the Company's Chicago operations described "the week of July 21st" only as the "new target date" for the Reroute. J.A. 170. And there was none of the evidentiary documentation of the planned transition that the Company had put in place prior to the failed April date. There was no email to Northlake plant executives. No evidence of communication with clients that the change was set for a date certain. No paperwork provided to the Representatives advising them of the end date for their Representative positions and the start date for their new roles. The most the Company mustered was an email to some managers in Texas stating that the July 21st date was a "target[,]" J.A. 170, and notes from an oral notification to the Representatives in the office on July 14th that the Reroute had been rescheduled. Even as to that, Troutman was candid that he could not say with "a hundred percent certainty" that all the Representatives had been informed of the proposed Reroute date. J.A. 62.

To be sure, Troutman testified that he was confident the Reroute would actually happen in July. But that confidence had proven misplaced before. *See* J.A. 41 ("Q. So as of March 14, 2019, in your e-mail you're saying that the company is going to implement effective April 1, 2019; is that right? A. That is correct. Q. And that was the plan, to implement April

1, 2019, right?  A.  Not only the plan.  It was locked set in stone it was happening[.]   Q.   It was locked set in stone that it was going to happen April 1, 2019?  A.  Correct.  Q.  Did it happen April 1, 2019?  A.  It did not.").

Given all of that, the Regional Director reasonably found that the July 21st "target" date was an aspiration, not a "locked set in stone" date.  J.A. 182–183; *cf. Committee for a Better Arvin v. EPA*, 786 F.3d 1169, 1179 (9th Cir. 2015) (establishing a "target" is not the same as promising to attain it).  The Company's track record of missed and rescheduled Reroute dates was lengthy, and the concrete steps to notify affected workers and provide them with the needed paperwork were more tentative in July than they had been in March.  And even those extra measures proved to be unreliable indicia for an actual Reroute implementation in April.  On this record, the Regional Director sensibly found, and the Board reasonably agreed, that the Reroute's implementation date was anything but certain at the time of the representation election.

**B**

The Board's conclusion was also consistent with its own precedent.  *See Retro Env't*, 364 NLRB No. 70, at *6 ("The Board will not dismiss an election petition based on conjecture or uncertainty concerning an employer's future operations, an employer's contention that it intends to cease operations or reduce its workload sometime in the future, or evidence of cessation that is conditional or tentative."), *enf't granted*, 738 F. App'x 200 (4th Cir. 2018); *see also Gibson Elec.*, 226 NLRB 1063, 1063 (1976) (ordering representation election in part because the employer inaccurately forecasted date by which it would lay off workforce and workers remained employed); *March Assocs. Constr.*, 2012 WL 1496208, at *1 n.1 (NLRB April 27, 2012) ("[U]nsubstantiated, uncorroborated

testimony" from the president and owner of the employer was "insufficient to establish the imminent and certain elimination of the unit.").

The Company points to *M.B. Kahn Construction Co.*, 210 NLRB 1050 (1974), as a case where the Board credited uncontroverted testimony from the employer in determining that unit contraction was definite and imminent. But agencies must resolve matters based on the whole record, *see American Wrecking Corp. v. Secretary of Labor*, 351 F.3d 1254, 1261 (D.C. Cir. 2003) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)), and that full record is what courts must review as well, *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018).

The differences between the record in this case and in *M.B. Kahn* are stark. In *M.B. Kahn*, the employer had not been plagued by false starts like the Company here, and all evidence indicated that the project had been and would remain on schedule with associated termination dates occurring as planned. *See* 210 NLRB. at 1050–1051. Indeed, in that case there was testimony that, "although there had been a strike at the project it had no effect on the target [termination] dates originally contemplated." *Id.* at 1050 n.1. The record in this case (both before the Board and in this court) quite simply lacks the unblinking march toward actual contraction that appears in the cases on which the Company relies.[3] If anything, the

---

[3] *E.g.*, *Hughes Aircraft*, 308 NLRB at 83 (noting that decision to contract had "methodically been carried forward" and sealed in contractual letters of intent); *Larson Plywood Co.*, 223 NLRB 1161, 1161 (1976) (noting that the corporate board had decided to shut down the plant within 90 days, and there was "no evidence of any inconsistent action on the part of the Employer"); *see also Martin Marietta Aluminum*, 214 NLRB 646, 646–647 (1974) (unit

contrast between those cases and this one underscores the reasonableness of the Board's judgment.

Nor did the mere fact that Troutman's testimony about the July 21st date was not expressly contradicted foreclose the Regional Director or Board from reasonably drawing a contrary conclusion based on all of the evidence in the record. For example, information elicited on cross-examination can provide substantial evidence on which the Board could rely to undermine the assertions made by the employer on direct examination. *See, e.g.*, *Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1102–1105 (D.C. Cir. 2019). That is what happened here. *Compare* J.A. 32, 34 ("Q. And is the July 21 date now a date certain when the company intends to implement this? A. That is the date we're going to implement, correct."), *with* J.A. 41 (Troutman admitting Reroute did not occur on April 1st).

The Company next argues that the Regional Director "applied [an] incorrect legal standard" because, in its view, he required the Company to demonstrate that the Reroute would "definitely occur on an exact calendar date." Company Br. 35–36. Not so.

The Company is correct that the Board's cases do not require an employer to prove that a unit contraction will occur on a specific date. The employer instead may identify a period of time during which contraction is planned. *E.g.*, *Hughes Aircraft Co.*, 308 NLRB at 83 (contraction planned "between August 3 to 16, 1992"); *Larson Plywood Co.*, 223 NLRB at 1161 (contraction planned "within 90 days"); *General Elec.*

---

contraction was definite and imminent where employer "was already in the process of closing the plant prior to the filing of the petition," and "[a] substantial number of employees had already been terminated before the hearing").

*Co. (Trenton, NJ)*, 101 NLRB 1341, 1344 (1952) (contraction planned "sometime * * * in mid-August").

But the Regional Director never required that the Company confine itself to a single date for the Reroute. It was the Company that repeatedly advanced a single date—July 21st—as the impending date of contraction. All the Regional Director's decision did was respond to the Company's position and decide whether a contraction on that date was, in fact, definite and imminent. The Company offered no broader window of time for the Reroute, and so the Regional Director did not consider one. Nothing wrong with that.

Finally, the Company contends that the fact that the Regional Director later declined to pursue an unfair labor charge against the Company relating to the elimination of the Representatives' position casts a suspect light on the Board's decision.

The short answer is that this matter is not in the record, and "[i]t is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made." *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981); *see also* 29 C.F.R. § 102.68 (defining record in pre-election proceeding).

The point is also irrelevant. When Regional Directors decline to bring charges, they do so by exercising authority delegated from the General Counsel rather than from the Board. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975). And when the General Counsel declines to issue a complaint, "no proceeding before the Board occurs at all[,]" *id.* at 139, and the action has no precedential value whatsoever.

Anyhow, that the Company's Reroute was determined after the fact not to be an unfair labor practice has no relevance to the certainty and imminence of the Reroute at the time the Regional Director rendered his decision.

For similar reasons, it is irrelevant that the Reroute did, in fact, occur on July 21st. The Regional Director's task was to make a prediction about whether the Reroute was certain to occur on that date. The issue before the Board and us is only the reasonableness of that prediction at the time it was made. Needless to say, the fact that the Reroute actually happened was not and could not have been in the record before the Regional Director when he decided on July 3rd that implementation of the Reroute was not, at that time, either certain or imminent.

## IV

The Board also correctly denied the Company's objections to the election process itself.

The Board's discretion to assess the propriety and results of representation elections is broad, and we will overturn a Board decision to certify an election only in "the rarest of circumstances." *North of Market Senior Servs., Inc. v. NLRB*, 204 F.3d 1163, 1167 (D.C. Cir. 2000). The employer bears "a heavy burden" in "showing that the election was improper." *Amalgamated Clothing Workers v. NLRB*, 424 F.2d 818, 827 (D.C. Cir. 1970). Where, as here, the objections are based on the alleged conduct of the Board's agent—in refusing to allow challenges to the Representatives' ballots and in failing to prevent the recording of the ballot tabulation—an election will be overturned only if the objections raise a "reasonable doubt" as to its fairness and validity. *Polymers, Inc.*, 174 NLRB 282, 282 (1969).

The Board correctly overruled the Company's objection that the Regional Director should have recorded a challenge to each vote cast by a Representative. The Regional Director specifically included the Representatives as eligible voters in his Decision and Direction of Election. And Board precedent is settled that "[p]ersons specifically included by the Decision and Direction of Election should be given a ballot and permitted to vote *without challenge*, unless there have been changed circumstances." *Anheuser-Busch, LLC*, 365 NLRB No. 70, at *1 (2017) (quoting NLRB Casehandling Manual (Part Two) Representation Proceedings § 11338.7). Indeed, the Board's long-established procedure and practice is "to deny any party to an election the opportunity to challenge the ballots of individuals in categories as to which the Board has already ruled on eligibility[,]" and "[t]his has been announced many times in Board decisions, as well as in the Board's Field Manual, and should be clearly understood by all Board personnel and by members of the bar who regularly practice before th[e] Board." *Amalgamated Clothing Workers*, 217 NLRB 98, 98 (1975).

The Company says that it demonstrated "changed circumstances" by confirming on July 12th that the Reroute was still on track for July 21st. But this "confirmation" amounted to nothing more than a verbal statement by the Company's Director of Labor Relations that the "previously announced elimination of the [Representative] position would proceed as scheduled[.]" J.A. 225. Just reiterating the same general assertion already rejected by the Regional Director nine days earlier does not changed circumstances make. Tellingly, the Regional Director had spelled out what kind of factual evidence might demonstrate that the Reroute was truly imminent—like the provision of new offer letters to the Representatives reflecting updated effective dates, or written confirmation that the master data source upon which the

Reroute depended had been updated. The Company produced neither of those. The mere "passage of time without any change in [the Company's] position," Company Br. 19, cannot itself sensibly be considered a changed circumstance.

The Board has also declined to set aside elections on the basis of challenged ballots where those ballots were "not determinative" of the election result. *See, e.g.*, *J.C. Brock Corp.*, 318 NLRB 403, 404 (1995); *see also KCRA-TV*, 271 NLRB 1288, 1289–1290 (1984) (counting improperly cast ballots would be "harmless error" if they "could not affect the results of the election"). That principle applies here. Seven of the thirty-five Representatives were becoming account managers, and therefore remained eligible to participate in the bargaining unit. That means that only 28 of the 35 Representatives would have been ineligible to vote. Yet even if all 28 of those Representatives were subtracted from the pro-Union votes, the final tally would still be 18 votes in favor of the Union and 16 votes against. So, as then-Member McFerran explained, the challenges would not have been outcome determinative. *See National Mining Ass'n v. United States Dep't of Interior*, 251 F.3d 1007, 1014 (D.C. Cir. 2001). That is not "pure speculation[,]" as the Company suggests. *See* Company Reply Br. 13. That is arithmetic.

The Company's objection to the Union's recording of the ballot tabulation fares no better. An election may not be overturned based on conduct that occurred after the close of voting and did not bear on the outcome of the election. *See Mountaineer Bolt, Inc.*, 300 NLRB 667, 667 (1990) (quoting *Head Ski Co.*, 192 NLRB 217, 218 (1971)). The recording here took place after the polls had closed and could not conceivably have had any bearing on the results.

## V

For those reasons, the Company's petition for review is denied, and the Board's cross-application for enforcement is granted.

*So ordered.*