# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 19, 2023          Decided July 9, 2024

No. 22-1312

GHG MANAGEMENT LLC, D/B/A WINDY CITY CANNABIS,
D/B/A CURALEAF WEED STREET,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with 23-1015

———

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board

———

*Maurice Baskin* argued the cause for petitioner. With him on the briefs was *Stefan Marculewicz*.

*Gregoire F. Sauter*, Senior Attorney, National Labor Relations Board, argued the cause for respondent. On the brief were *Jennifer Abruzzo*, General Counsel, *Ruth E. Burdick*, Deputy Associate General Counsel, *David S. Habenstreit*,

Assistant General Counsel, *Usha Dheenan*, Supervisory Attorney, and *Jared D. Cantor*, Senior Attorney.

Before: SRINIVASAN, *Chief Judge*, HENDERSON, *Circuit Judge*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*: In 2021, employees at a Chicago cannabis dispensary voted on whether to be represented by a union. After voting commenced, the union and employer agreed to extend the election timeline to account for apparent delays in mail delivery. During the time extension, the National Labor Relations Board Agent overseeing the election told the parties that the office had received ballots from all voters who said they had mailed them. The Board Agent, however, did not relate that a ballot had yet to be received from another voter who had said she planned to mail hers. The vote count took place a few days later, with the union prevailing by one vote. The following day, the outstanding ballot arrived.

The company objected to the validity of the election, including based on the failure to count the last-arriving ballot. The Board denied the objections and certified the union. The company now seeks review of the Board's certification. The company claims, among other things, that the Board Agent's communication about outstanding ballots misled the parties and affected the outcome of an election that had been decided by one vote.

In rejecting that objection, the Board applied a line of decisions allowing for setting aside an election only when a party establishes reasonable doubt about the election's validity and fairness. The Board rejected the company's argument that

it should have applied an alternate line of decisions that would permit setting aside an election based on a lesser showing of prejudice—if there has been *possible* outcome-determinative disenfranchisement.

In defending its approach in our court, the Board does not dispute that the company's objection might have been sustained under the latter test; it instead argues only that applying the former test was correct. The Board, however, has failed to provide a coherent explanation for why the first test applies instead of the second. For that reason, we are unable to sustain the Board's decision.

I.

A.

This case concerns an effort to unionize the "product specialists" at the Curaleaf store on West Weed Street in Chicago, Illinois. In January 2021, United Food and Commercial Workers Local 881 petitioned the National Labor Relations Board to administer a vote to determine whether the union would be the exclusive collective-bargaining representative for the dispensary's product specialists.

The union and Curaleaf entered into a stipulated agreement setting out the terms of the election. The parties agreed that the election would occur by mail under the following timeline: the Board's Regional Office would mail ballots to eligible voters on February 25; the ballots would be due back to the Regional Office by March 19; and the Regional Office would count the ballots on the morning of March 22. The parties stipulated that "[i]f any eligible voter does not receive a mail ballot or otherwise requires a duplicate mail ballot kit, he or she should contact the [Regional Office] by no later than 5:00 p.m. CST on March 4, 2021 in order to arrange

for another mail ballot kit to be sent to that employee." J.A. 108.

One employee, Lisa Wratten, found herself in need of such a replacement ballot. Wratten did not receive an original ballot because she moved without updating her address with the employer. In early March, Wratten conveyed to the Board Agent that she needed a replacement ballot to be sent to her new address. The Agent texted Wratten on March 10, telling her that a duplicate ballot had been sent that day, and texted her again on March 15 to ask whether she had received that duplicate ballot. The following day, Wratten confirmed she had received the ballot and said she was mailing it that day. (In fact, Wratten did not mail the ballot until March 18.)

Around this time, the parties agreed to extend the election timeline. On March 19—the day the ballots were originally due back to the Regional Office, and three days before the count was to take place—the parties entered into a second stipulated agreement. That agreement noted that, as of that date, the Regional Office had received only fifteen of the thirty ballots that had been mailed to voters, so "[t]here [was] a concern that not all . . . ballots mailed back to the Regional Office [had] been received." *Id*. at 58–59. Curaleaf and the union agreed on a new deadline: to be counted, ballots had to be received by March 31. The Regional Office issued a corresponding order.

The Board Agent and parties later exchanged a series of emails about outstanding ballots. On March 22, the Agent emailed the lawyers for Curaleaf and the union, writing:

> [T]he 3 ballots I had been expecting plus a couple more came in to our office late [on March 19]. So we've received ballots from all

> at least that have told me that they sent their ballots in.

*Id*. at 61. Wratten's ballot was not one of those three ballots, even though Wratten had days earlier told the Board Agent she had mailed her replacement ballot. The Board Agent's email concluded by saying that, because the Regional Office had received "about" twenty ballots, she "expect[ed]" to "go[] forward with the count on [March 31]." *Id*.

Adhering to that plan, the Regional Office counted the ballots on March 31. The union prevailed by one vote: eleven to ten. The same day, Curaleaf emailed the Regional Office asking it to retain any late-arriving ballots. The company explained that, given the one-vote margin, it was concerned that mail delays might have affected the election outcome. The Board Agent responded to the company and union, agreeing to the company's request and adding: "As you both know, as of [March 18,] before the original count scheduled on [March 22], there were 3 voters that had separately informed me they mailed their ballot but we had not received them at my office. That led us to reschedule the count. Those 3 voters' ballots were then received the following day, on [March 19]. Thus, we received a ballot from each voter that had contacted me." *Id*. at 62.

The next day, Wratten's ballot arrived at the Regional Office. The Board Agent emailed the parties to let them know the office had received Wratten's ballot, and to explain why that ballot was not one of the three outstanding ballots described in the prior email exchanges:

> While [Wratten] contacted me to request the duplicate, she did not request that I confirm we received her ballot, so she was not "on my radar" to contact upon receiving her ballot. In

any event, I'd like to clarify my statement [in the email exchange] below, "we received a ballot from each voter that had contacted me," such that we received a ballot from those that contacted me to ask that I confirm when their ballot has been received by my office.

*Id.* at 62. The Regional Office received no additional ballots.

## B.

Curaleaf raised various objections to the election and asked that a new, in-person election be held. Four objections, Objections 1, 2, 4, and 5, remain relevant.

In Objections 1 and 2, the company alleged that actions by the Regional Office or Board Agent caused outcome-determinative voter disenfranchisement. In Objection 1, the company claimed disenfranchisement resulted from the Regional Office's delay in processing ballots and from "extraordinary and arbitrary delays with the United States Postal Service." J.A. 115. In Objection 2, the company claimed that disenfranchisement resulted from the Board Agent's "fail[ure] to notify the parties that the Region was aware that at least one voter [i.e., Wratten] had returned a ballot but it had not been received by the Region as of the ballot count." *Id*. at 115–16. In Objection 4, the company asserted that the Regional Office wrongfully "force[d] postponement" of the ballot count. *Id*. at 116. And in Objection 5, the company alleged that the Board's failure to issue a second Notice of Election with the updated election timeline was either a "per se" procedural violation that required setting aside the election or an objectionable election "irregularity." *Id*. at 134, 147; *see id.* at 116.

The Board's Acting Regional Director rejected all of Curaleaf's objections and certified the union as the employees' representative. The Board granted Curaleaf's request for review, but only as to Objection 2, thereby giving its "imprimatur" to, and making final, the Acting Regional Director's determinations with respect to Objections 1, 4, and 5. *UC Health v. NLRB*, 803 F.3d 669, 680 (D.C. Cir. 2015). Objection 2, as just noted, alleged that the Board Agent "affected the outcome of the election by misrepresenting the status of" Wratten's ballot. *GHG Mgmt. LLC*, 371 N.L.R.B. No. 93, at 1 (Apr. 21, 2022). The Board explained that the "test for setting aside an election based on regional office conduct is whether the alleged irregularity raises 'a reasonable doubt as to the fairness and validity of the election,'" a standard that requires the objecting party to show "actual prejudice"—i.e., "prejudicial harm" that is "more than speculative." *Id*. at 2 (quoting *Guardsmark, LLC*, 363 N.L.R.B. 931, 934 (2016)).

That burden, the Board determined, had not been met by Curaleaf. The Board assumed "that the Board Agent's March 22 email misled the parties" into thinking "that the Region had received all [of] the outstanding ballots." *Id*. Even so, the Board found, the company was unable to show anything more than conjectural harm. *Id.* While Curaleaf argued that it would have sought a second extension had it known about Wratten's outstanding ballot, the Board found the possibility of prejudice to be speculative: "Even assuming" Curaleaf would have sought a second extension and the union would have agreed, the Board observed, "the Acting Regional Director was under no obligation to grant a second extension[,] and it would not have been an abuse of discretion to deny a request for a second extension based on one possibly outstanding ballot." *Id.* (parentheses omitted).

8

One Board member dissented. *Id*. at 2 n.7. Unlike the majority, the dissenting member did not find it dispositive that the Acting Regional Director could have refused to approve a second extension: in such an event, the dissenting member suggested, Curaleaf "could have sought extraordinary relief," including by asking a Board panel to review the decision. *Id*. at 3 n.7 (citing 29 C.F.R. § 102.67(j)).

Following the Board's decision, the union sought to bargain with Curaleaf, Curaleaf refused, and the Board's General Counsel brought an administrative complaint against the company claiming it committed unfair labor practices by refusing to recognize and bargain with the union. As a defense, the company reasserted its challenge to the union's certification. The Board granted the General Counsel's motion for summary judgment. *GHG Mgmt. LLC*, 372 N.L.R.B. No. 13, at 1 (Dec. 5, 2022).

Curaleaf filed a petition in our court seeking review of the unfair labor practice order, and the Board filed a cross-application seeking enforcement of the order.

II.

Curaleaf argues that the Board was wrong to overrule the company's objections under the legal tests the Board applied. But the company also contends as an antecedent matter that the Board applied the wrong tests, or, at the very least, failed adequately to explain its reasons for applying one test instead of another. We agree with the last of those contentions: we find that the Board failed to justify its application of different tests to different objections, so we are unsure whether the Board's approach was reasonable in light of its precedent. We thus do not reach the question whether the Board properly overruled the objections under the tests it applied.

We have jurisdiction pursuant to Section 10 of the National Labor Relations Act, which permits the Board to petition for enforcement of an unfair labor practice order, and permits "[a]ny person aggrieved by a final order of the Board" to "obtain review" of that order. 29 U.S.C. § 160(e), (f). While the Board's certification of the election is not a final order, it is indirectly reviewable because "the dispute concerning the correctness of the certification eventuate[d] in a finding by the Board that an unfair labor practice ha[d] been committed" by Curaleaf based on its "refus[al] to bargain with a certified representative on the ground that the election was" improper. *Boire v. Greyhound Corp.*, 376 U.S. 473, 477 (1964).

"As we have noted many times before, our role in reviewing [a Board] decision is limited," *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012) (citation and internal quotation marks omitted), and we are particularly deferential to Board decisions regarding representation elections, *see Am. Bottling Co. v. NLRB*, 992 F.3d 1129, 1136 (D.C. Cir. 2021). That said, "deference is not warranted where the Board fails to adequately explain its reasoning" or "leaves critical gaps in its reasoning." *DHL Express, Inc. v. NLRB*, 813 F.3d 365, 371 (D.C. Cir. 2016) (citations and internal quotation marks omitted). That is the case here.

The parties' dispute over whether the Board evaluated the company's objections under the correct test centers on two tests that derive from separate lines of Board decisions: the "possible-disenfranchisement test" and the "reasonable-doubt test." While the Board also relied on other more specific Board precedent—for example, Board decisions that address how to evaluate mail irregularities—the two aforementioned tests provided the overarching framework for the Board's evaluation of the company's objections. And there is no dispute that the difference between the two tests can be a material one in that,

as we explain next, one requires a greater showing of prejudice than the other.  As a result, the absence of any coherent explanation by the Board concerning when one test or the other applies is a threshold problem that calls for remanding the matter for further explanation before going on to address any specific contentions about the application of either test:  we can only address the application of a test to a given objection after first determining which test governs the analysis.

The Board often relies on the first test, the possible-disenfranchisement test, when a party objects that an election irregularity led to outcome-determinative voter disenfranchisement.  That test, the Board has explained, "applies an objective standard to potential disenfranchisement cases in order to maintain the integrity of [the Board's] own election proceedings." *Garda World Sec. Corp.*, 356 N.L.R.B. 594, 594 (2011) (citing *Wolverine Dispatch, Inc.*, 321 N.L.R.B. 796, 797 (1996)).  "Under that standard, an election will be set aside if the objecting party shows that the number of voters *possibly* disenfranchised by an election irregularity is sufficient to affect the election outcome." *Id.*  (emphasis added).  Thus, a party need not show that "any voters" were "*actually* disenfranchised" by the irregularity.  *Wolverine Dispatch*, 321 N.L.R.B. at 797.  As an adjunct to the possible-disenfranchisement test, moreover, the Board will sometimes invoke still another test, the "notice-and-opportunity test," under which an election will be upheld if "there [was] adequate notice and opportunity to vote and employees [were] not prevented from voting by the conduct of a party or by unfairness in the scheduling or mechanics of the election." *Lemco Constr., Inc.*, 283 N.L.R.B. 459, 460 (1987).

The Board will sometimes apply the alternative test, the reasonable-doubt test, when a party complains that an action by a Board agent or regional office should invalidate an election.

As the Board has explained: "The test for setting aside an election based on regional office conduct is whether the alleged irregularity raised 'a reasonable doubt as to the fairness and validity of the election.'" *Guardsmark*, 363 N.L.R.B. at 934 (quoting *Polymers, Inc.*, 174 N.L.R.B. 282, 282 (1969), *enforced*, 414 F.2d 999 (2d Cir. 1969)). That test calls for a more demanding showing of prejudice than the possible-disenfranchisement test. In particular, to meet the reasonable-doubt test's burden, "[t]he objecting party's showing of prejudicial harm must be more than speculative." *Id.*

Curaleaf principally objects to the Board's application of different tests to Objection 1 and Objection 2. Objection 1, recall, alleged that ballot-processing delays attributable to the Regional Office and mail delays caused by the Postal Service led to outcome-determinative voter disenfranchisement. To overrule that objection, the Board (in the form of the Acting Regional Director, whose determination was left undisturbed) seemed to rely primarily on the possible-disenfranchisement test along with the notice-and-opportunity adjunct. In our court, the General Counsel accordingly defends the applicability of those tests to that objection.

The Board chiefly relied on the alternate test, the reasonable-doubt test, when overruling Objection 2. That objection alleged that the Board Agent misled the parties about the status of Wratten's ballot and therefore caused her ballot to go uncounted. The Board said the reasonable-doubt test is the correct "test for setting aside an election based on regional office conduct." *GHG Mgmt. LLC*, 371 N.L.R.B. No. 93, at 2. In our court, the General Counsel thus defends the application of the reasonable-doubt test to Objection 2.

Curaleaf argues that the Board failed adequately to explain why one test rather than the other applied to the company's

objections. Most pointedly, the company contends that the Board should have applied the possible-disenfranchisement test to Objection 2. In response, the General Counsel does not deny that Objection 2 might have been sustained had the Board applied the possible-disenfranchisement test rather than the reasonable-doubt test. Instead, the General Counsel's position hangs entirely on its contention that it was correct to evaluate Objection 2 under the reasonable-doubt test.

The General Counsel's explanation in that regard falls short. The General Counsel accepts that some actions of a regional office or Board agent relating to an election can be evaluated under the possible-disenfranchisement test rather than the reasonable-doubt test. According to the General Counsel, the Board's choice between the two tests turns on whether the objection concerns Board "misconduct": the possible-disenfranchisement standard "applies to objections, such as Objection 1, where the allegation entails employees being 'prevented from voting by the conduct of a party or by unfairness in the scheduling or mechanics of the election,'" but "it is not the governing standard for agent-misconduct objections." NLRB Br. 39 (quoting *Lemco*, 283 N.L.R.B. at 460). And, the General Counsel adds, the "fact that a misconduct-based objection *also* claims resulting voter disenfranchisement does not render inapplicable the reasonable-doubt test or the necessity of proving non-speculative prejudice." *Id*. at 38 (emphasis added) (citing *Guardsmark*, 363 N.L.R.B. at 934 & n.14).

In sum, the General Counsel asserts that the reasonable-doubt test displaces any other test when Board "misconduct" is at issue, even if that misconduct is alleged to have caused disenfranchisement. The General Counsel concludes that the Board was correct to evaluate Objections 2, 4, and 5 under the

reasonable-doubt test because those objections ostensibly concerned Board misconduct while Objection 1 did not.

We cannot accept the General Counsel's effort to justify the Board's approach. To start, we are unable say that the choice between the tests turns on the presence or absence of Board "misconduct" because we do not know what that term means in this context. The General Counsel contends that "[t]he numerous cases cited by" Curaleaf "are unavailing" because, "unlike Objection 2, none of them analyze objections based on alleged *misconduct* by a Board regional office or agent." *Id*. at 39 (emphasis added). Those cases, the General Counsel asserts, "involve regional offices' failure to (timely) send ballots (or duplicate ballots) to voters" or involve Board agents' "clos[ing] the polls or fail[ing] to open them when they were scheduled to be open." *Id*. at 39–40.

It is not at all apparent, though, why a regional office's or Board agent's failure to timely mail ballots or to keep the polls open at scheduled times would not qualify as Board "misconduct." Indeed, the General Counsel sometimes describes misconduct as "*improper conduct* of the Board's regional office or its agent." *Id*. at 31 (emphasis added). We are left wondering: why is it not "improper conduct" to fail to send ballots in a timely fashion or to close the polls when they are supposed to be open? The General Counsel's unelaborated assertion that those actions are not "misconduct" because they occurred in "factually and legally distinct situation[s]" is unhelpful. *Id*. at 40.

In addition, the Board in the proceedings below did not offer—much less rely on—the explanation the General Counsel now presents to us. The Board did not indicate that the proper test hinges on the presence or absence of "misconduct," however defined. Instead, when overruling

Objection 2, the Board simply asserted that the reasonable-doubt test applies when a party complains that "regional office conduct" merits "setting aside an election." *GHG Mgmt. LLC*, 371 N.L.R.B. No. 93, at 2. And the Board did not explain what factual or legal considerations dictated the application of different tests to Objections 1 and 2. The Board, that is, did not justify treating the Board Agent's allegedly misrepresenting the status of an outstanding ballot (Objection 2) differently from her allegedly failing to promptly send a replacement ballot (Objection 1), even though Curaleaf argued that both actions led to outcome-determinative disenfranchisement and should thus be evaluated under the same (possible-disenfranchisement) standard.

To be sure, the Board might not need to offer a fuller explanation if its approach were compelled by clear Board precedent: while we "may not accept [the General Counsel's] *post hoc* rationalization for agency action," *Temple Univ. Hosp., Inc. v. NLRB*, 929 F.3d 729, 734 (D.C. Cir. 2019) (citation omitted), and the Board "must explain why [its own relevant precedent] is not controlling," the Board is not obligated "to distinguish a precedent expressly if the grounds for distinction are readily apparent," *Antelope Valley Bus Co. v. NLRB*, 275 F.3d 1089, 1092 (D.C. Cir. 2002) (citations omitted); *accord NCR Corp. v. NLRB*, 840 F.3d 838, 843 (D.C. Cir. 2016). But this is not a case in which the Board simply failed to state the obvious. The General Counsel offers no case squarely supporting the notion that the presence of Board "misconduct" means the reasonable-doubt test applies instead of the possible-disenfranchisement test even when a party alleges outcome-determinative disenfranchisement.

For example, the General Counsel cites our decision in *American Bottling Co.* as evidence of our "express approval" of its position. NLRB Br. 37–38 (citing *Am. Bottling Co.*, 992

F.3d at 1140). But while we applied the reasonable-doubt test there, we had no occasion to engage the possibility that a different test might apply. And we found that, as a factual matter, the number of challenged ballots could not be outcome-determinative. *See Am. Bottling Co.*, 992 F.3d at 1141. So the decision cannot stand for the proposition that the reasonable-doubt test necessarily displaces the possible-disenfranchisement test when "misconduct" is at issue.

Because we cannot uphold a Board order that "failed to apply the proper legal standard" or that "reflects a lack of reasoned decisionmaking" by "fail[ing] to offer a coherent explanation of agency precedent," we remand this case to the Board for further explanation. *Commc'ns Workers of Am., AFL-CIO v. NLRB*, 994 F.3d 653, 658 (D.C. Cir. 2021) (citations omitted). On remand, the Board must justify—or reconsider—its application of the possible-disenfranchisement test to Objection 1 and the reasonable-doubt test to Objections 2, 4, and 5. Specifically, the Board must explain when those (or other relevant) tests apply and why the specific conduct Curaleaf objects to in this case should be evaluated under one test instead of another. If the Board continues to believe its approach was correct, the Board must respond to the company's arguments that Objections 2, 4, and 5 should be evaluated—and indeed sustained—under the possible-disenfranchisement test.

We thus grant the company's petition for review only insofar as we require further explanation from the Board. At this point, because we express no opinion on whether any of the company's objections should be sustained, the Board does not need to set aside the election.

16

\* \* \* \* \*

For the foregoing reasons, we grant Curaleaf's petition for review, deny without prejudice the Board's cross-application for enforcement, and remand the case for clarification consistent with this opinion.

*So ordered.*